Ralph NADER, Appellant,

v.

Ralph de TOLEDANO and Copley
Press, Inc., Appellees.

No. 13019.

District of Columbia Court of Appeals.

Argued June 29, 1978.

Decided July 31, 1979.

Rehearing and Rehearing En Banc
Denied Sept. 26, 1979.

Michael Nussbaum, Washington, D. C., with whom Ronald G. Precup and Lucien Hilmer, Washington, D. C., were on brief, for appellant.

Nicholas S. McConnell, Washington, D. C., with whom Kenneth Wells Parkinson, Washington, D. C., was on brief, for appellee Ralph de Toledano.

John R. Keys, Jr., Washington, D. C., with whom John R. Reilly, Washington, D. C., was on brief, for appellee Copley Press, Inc.

Before NEWMAN, Chief Judge, and KERN and HARRIS, Associate Judges.

NEWMAN, Chief Judge:

This is an appeal from summary judgment for the defendants in a libel action brought by Ralph Nader against journalist Ralph de Toledano and his syndicator, Copley Press, Inc., for statements made by de Toledano in a column distributed by Copley. In determining whether summary judgment was properly entered against appellant, we are called upon to decide a threshold issue of first impression in this court— the showing which a public figure plaintiff must make in order to defeat a defense motion for summary judgment in a libel action governed by the constitutional standards enunciated in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (*New York Times*).[1] We

---

1. Appellant Nader alleged in his complaint, and appellees agree, that he is a "public figure", as contemplated by the Supreme Court in the companion cases of *Curtis Publishing Co. v. Butts*, and *Associated Press v. Walker*, 388 U.S. 130, 154–55, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), and *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The *Gertz* Court defined the "public figure" concept thusly:

 That designation may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions. [418 U.S. at 351, 94 S.Ct. at 3012–3013.]

 *See also Time, Inc. v. Firestone*, 424 U.S. 448, 453–55, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976) (further clarifying "public figure" concept).

reverse the summary judgment as to appellee de Toledano and remand for trial; we affirm as to appellee Copley Press.

## I

The dispute in this case has its origins in the public controversy which surrounded the issue of the safety of the Corvair automobile, manufactured by General Motors (GM) during the early 1960's. In the intense public debate on the question, appellant Nader was a principal spokesman for critics who contended that defects in the Corvair's basic design presented an unreasonable risk of harm to millions of Americans on the nation's streets and highways. Defending the efficacy of the Corvair design, GM maintained that the Corvair was as safe as any other comparable American vehicle. It was amidst this controversy that the United States Senate Subcommittee on Executive Reorganization and Government Research, chaired by Senator Abraham Ribicoff, held hearings in March 1966 on the subject of GM's investigation and surveillance of appellant because of his general criticism of automobile design and his vigorous anti-Corvair campaign in particular. Despite the narrow focus of the subcommittee's inquiry, the safety of the Corvair became an issue during the hearings. It was first raised by Aloysuis F. Power, then general counsel of GM, who stated for the record that the Corvair was not an unsafe vehicle and cited in support of his contention two personal injury cases involving the Corvair in which GM had won jury verdicts. During his testimony at the hearings, appellant attacked the Corvair's safety; as support for his contention, he submitted a supporting design study of the Corvair prepared by a private consulting firm. James Roche, then Chairman of GM, then inserted in the record copies of relevant testimony supportive of the Corvair which had been given before the Michigan State Legislature in February 1966 by Louis Bridenstine, then assistant general counsel of GM, and Frank Winchell, then chief of research and development at the Chevrolet Division. Other witnesses at the hearing also testified with regard to the Corvair's general safety.

In its report to the Senate on the general issue of the federal role in traffic safety, the subcommittee alluded to the continuing controversy surrounding Corvair, as manifested by the Nader-GM hearings and the volume of litigation in process over the safety of the 1960–63 Corvair design. However, the subcommittee made no finding with respect to the Corvair's safety, noting that such a determination lay beyond the scope of its subject matter jurisdiction (which did not extend to traffic and highway safety legislation) and its technical competence.

Subsequently, in 1970–71, appellant Nader wrote a series of letters to John Volpe, then Secretary of the Department of Transportation (DOT), and to Senator Ribicoff, requesting that their respective government agencies conduct official investigations into the Corvair's safety. He stated that GM, by its introduction of the Corvair on the market, had ignored the warnings of one of its own highly respected engineers as to the hazards of an automobile design (such as the Corvair's) which incorporated a rear engine and a swing axle rear suspension system as central features. He identified what he regarded as specific technical defects in the Corvair (e. g., enhanced rollover capability and hence inadequate vehicle stability due to, *inter alia*, dysfunctional rear suspension system and differential front and rear tire pressures), which necessitated further governmental inquiry and corrective action. According to Nader, GM persisted in its failure to adopt needed modifications in the early Corvair models which would have remedied these known design defects, even though it possessed the requisite technology. When GM did make design modifications in the 1964 and 1965 models, Nader contended, the company misrepresented the nature, purpose, and effect of such changes.

However, appellant's letters were primarily devoted to an indictment of the veracity and good faith of GM's conduct in relation to the Corvair before both national and

state legislative bodies and the courts. Nader charged, *inter alia*, that: (1) high-level GM officials maintained a special "hot documents" file—consisting of company-produced test data and films which conclusively demonstrated that the 1960–63 Corvair models were dangerously defective due to basic design flaws—which they conspired to, and did, suppress; (2) despite knowledge of the unsafety of the Corvair, GM continued to wage a campaign of public affirmation of the car's safety; (3) in 1966 GM officials made false statements attesting to the Corvair's safety in testimony before the Ribicoff subcommittee and the Michigan State Legislature (copies of which had been submitted to the Ribicoff subcommittee during its hearings) which they knew were contradicted by GM's secret test data and films; (4) GM repeated the same misrepresentations to Secretary Volpe; (5) GM had engaged in fraud and deceit in its defense of two personal injury cases involving the Corvair—*Anderson v. General Motors Corporation* (tried in Clearwater, Florida) and *Collins v. General Motors Corporation* (tried in Santa Clara County, California) through its unlawful failure to disclose as required by legal discovery procedures, GM test films and data critical of the Corvair's safety, and through the false and misleading testimony of GM defense witnesses as to the existence of such data and other safety issues. Nader based these allegations on his analysis of several documents—including portions of the transcript of the 1966 Ribicoff subcommittee hearings; transcript of the *Anderson* and *Collins* trials; and two GM proving ground test reports which he had obtained, PG 17103 and PG 15699. He recommended that Senator Ribicoff investigate the individual GM officials implicated by his allegations of misrepresentations during the 1966

hearings to determine whether the subcommittee should request a criminal investigation by the Department of Justice for possible violations of 18 U.S.C. § 1001 (1948).[2] Appellant released at least one of the letters to Senator Ribicoff, a 32 page document, detailing his allegations of GM's suppression of evidence and falsification of testimony before governmental agencies and the courts, to the press, which gave the controversy wide coverage.

Appellant further charged in a later communication that GM had substantially altered the official record of the Ribicoff subcommittee's 1966 hearings by making major deletions and additions in the transcript such that the official hearing record, as published in 1966, did not accurately reflect the substance of the sworn testimony.

In response to Nader's allegations, Senator Ribicoff requested that GM submit to the subcommittee all the documents and films cited by Nader in his correspondence, all other significant test reports, and all internal GM memoranda exchanged among the high-level GM officials designated by Nader relevant to the question of the Corvair's general safety. He also requested that Nader provide the subcommittee with all the information concerning the Corvair which he possessed. Thereafter, the Ribicoff subcommittee embarked upon an investigation, which spanned two and one-half years, into Nader's charges of GM's deceit of governmental agencies.

The investigation focused on two principal issues—the veracity of GM's testimony before the subcommittee in 1966 and GM's conduct of several lawsuits involving the Corvair.[3] In addition to studying the scores

---

**2.** The Code section makes it unlawful to knowingly and willfully falsify or conceal a material fact or make any false statement in any matter within the jurisdiction of any department or agency of the United States.

**3.** As a result of Nader's contention that DOT's National Highway Safety Bureau had neglected its duty to investigate the design hazards inherent in the Corvair, DOT conducted extensive performance tests of the 1962 Corvair model,

focusing on the car's stability and susceptibility to rollover, at the Texas Transportation Institute. The department employed three independent technical experts to assist in the evaluation of the Corvair results as measured against those of the five other contemporary automobiles against which the Corvair was tested. After study of the test data and films, DOT concluded in July 1972 that the handling of the 1960–63 Corvair models possessed no safety defect and that their handling and stability per-

of documents submitted by GM, and the 53 submitted by Nader, as well as other relevant materials provided at its request, the subcommittee staff interviewed almost 100 people for a total of 117 hours. Through interviews with both active and retired personnel at every level of GM, from top management to clerical and technical employees, the subcommittee sought to obtain all relevant information on the issues under study.

On March 14, 1973, after completion of the lengthy study, the subcommittee issued its findings and conclusions in an extensive report which was inserted into the Congressional Record. 119 Cong.Rec. 5870 (1973). The report addressed in systematic fashion each of the allegations which Nader had made against GM's conduct, both before the Senate subcommittee and in the courts, and the Corvair's safety, insofar as deemed relevant. In the subcommittee's view, the factual evidence yielded by its massive investigation provided no substantiation for Nader's claims. With regard to this central finding, the following statement appeared in the introduction (entitled "Summary") to the report:

> Although we have not upheld Mr. Nader's charges against the Corvair and General Motors, we believe they were made in good faith based on the information available to him. After gathering all the evidence concerning them, we can understand how he reached the positions stated in his letters. The documents he cites provide some support for his views. However, we believe the clear preponderance of the evidence, much of which was unavailable to Mr. Nader, is on the other side.

The body of the report consisted largely of a point-by-point refutation of Nader's charges. The subcommittee staff concluded specifically that the subcommittee had not been misled at the March 1966 hearing by testimony of GM witnesses regarding the stability and handling of the Corvair. The

subcommittee found that the DOT, Consumers Union, Ford, and GM test data and analyses supported GM's contention that the 1960–63 Corvair was safe and that its handling performance was comparable to that of other contemporary vehicles. The staff located no evidence that GM management officials had failed to consider any relevant data or documents supportive of a contrary conclusion. It further found that GM had not engaged in any fraud or deceit in its defense in the *Anderson, Collins*, or other cases which the subcommittee reviewed. The subcommittee could find no factual basis for Nader's accusations, which had been widely disseminated in the press, that GM engineer Frank Winchell had misrepresented the viability of the Corvair design and the car's general safety performance during his testimony at the 1966 subcommittee hearings and in several court cases involving the issue of Corvair safety. The subcommittee stated that Nader's accusations against Winchell were unjustified. It concluded that none of the other matters alleged by Nader warranted further investigation by the subcommittee or reopening of the hearings, or referral to federal or state law enforcement agencies. 119 Cong.Rec. at 5885.

Appellant's criticism of the Corvair and his subsequent involvement in the general field of consumer affairs have evoked widespread public discussion—ranging from praise from supporters to condemnation from hostile critics. Appellee de Toledano, a syndicated columnist based in Washington, D.C., is among those who have reported and commented on appellant's public interest advocacy. In January 1975, appellee de Toledano wrote a newspaper column concerning appellant's opposition to the development and utilization of nuclear power as a source of energy in this country. Appellee made the following statement:

> In this endeavor, Nader is being aided and abetted by Sen. Abraham Ribicoff,

formance was comparable to that of the other vehicles tested. Because Nader challenged the validity of the DOT conclusions, and because it was relevant to the issue of whether the sub-

committee had been misled as to the general safety of the Corvair, the Ribicoff subcommittee also addressed several issues relevant to the broad question of Corvair design safety.

D–Conn., who not long ago devoted some 250 devastating columns of the Congressional Record to demonstrate conclusively that Nader falsified and distorted evidence to make his case against the automobile.[4]

De Toledano furnished the column containing the statement to appellee Copley Press, Inc., for distribution to and publication by its subscribing newspapers. The column was in fact published.

Appellant initiated a libel action for $5,000 as compensatory damages and $1,000,000 as punitive damages, alleging that the above-quoted statement is libelous per se. Upon completion of discovery, appellees moved separately for summary judgment on the ground that appellant could not prove "with convincing clarity" that the allegedly libelous statement was published with "actual malice," as contemplated by the *New York Times* rule. The motions were both granted.

## II

During the past decade the Supreme Court has substantially rewritten the state law of defamation in recognition of the impact of the First Amendment on that body of law. *See generally* Robertson, *Defamation and the First Amendment: In Praise of Gertz v. Robert Welch, Inc.*, 54 Texas L.Rev. 199 (1976); Eaton, *The American Law of Defamation through Gertz v. Robert Welch, Inc. and Beyond: An Analytical Primer*, 61 Va.L.Rev. 1349 (1975). The Court commenced the process of defining the relationship between the First Amendment and defamation law in 1964 with the landmark decision of *New York Times, supra*. In that case, the Court reversed an Alabama state court judgment in a civil libel action in favor of an elected government official who claimed that he had been defamed by allegations published in a New York Times advertisement of his complicity in police action against civil rights demonstrators. The rationale for the Court's decision in that case rested on the

significance of the First Amendment in the context of American democratic society. Starting from the initial premise of our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," 376 U.S. at 270, 84 S.Ct. at 721, the Court proceeded to examine the relationship between the values implicit in the First Amendment and the American theory of government. From its analysis of the historical controversy over the Sedition Act of 1798 the Court derived two basic maxims: (1) that free discussion of political affairs and government officials is fundamental to the American system of self-government, and consequently, (2) that government sanctions of seditious libel is antithetical to the thesis of American democracy. 376 U.S. at 273–76, 84 S.Ct. 710. Therein lay the "central meaning of the First Amendment" for the Court. *See* Kalven, *The New York Times Case: A Note on "The Central Meaning of the First Amendment,"* 1964 Sup.Ct.Rev. 191, 204–05. Thus, the Court concluded that protection of public debate of public affairs lies at the core of the First Amendment free speech and free press guarantees.

Because the threat of defamation liability possesses great potential for intrusion on the zone of protected public speech, the Court deemed traditional defamation principles incompatible with First Amendment precepts. Reconciliation of the competing societal interests in the maintenance of an unimpaired flow of information and ideas fostered by a free press and the individual's interest in freedom from defamation necessitated construction of a new system of defamation liability reflective of the role of First Amendment liberties in our scheme of constitutional values. The Court, through the formulation of a restrictive rule of liability for defamation concerning the conduct of governmental affairs by public officials, thus imposed major restraints on a state's power to award damages to redress wrongful injury to an individual's reputa-

---

4. Appellee de Toledano stated in his deposition that the term "automobile" in the statement was meant to refer to the Corvair. See *Appendix* for the full text of the newspaper column.

tion. The *New York Times* Court established a federal rule, premised on "constitutional guarantees," prohibiting recovery by a public official for defamatory falsehood relating to his official conduct "unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–80, 84 S.Ct. at 726. The extension of a conditional constitutional privilege to defame as to matters within the realm of public discussion of public affairs, defeasible only upon publication of defamatory falsehoods with "actual malice," provided "freedoms of expression [with] the 'breathing space' that they 'need * * * to survive.'" 376 U.S. at 271–72, 84 S.Ct. at 721, quoting *NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). The Court thereby sought to implement the First Amendment policy of maximization of public debate through minimization of the incentives for self-censorship presented by the threat of defamation liability. *See* Anderson, *Libel and Press Self-Censorship*, 53 Tex.L.Rev. 422 (1975).

A series of Supreme Court decisions subsequent to *New York Times* involving civil and criminal sanctions in state defamation actions evince the Court's continuing "bias toward unfettered speech at the expense . . . of compensation for harm to reputation," *Buckley v. Littell*, 539 F.2d 882, 889 (2d Cir. 1976). As the Court stated in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974), "[u]nder the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." (Footnote omitted.) In these cases, the Court has expanded and clarified the privilege created by *New York Times* by a process of "dialectic progression." *Kalven, supra* at 221. *See Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); *Henry v. Collins*, 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965) (per curiam); *Rosenblatt v. Baer*, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); *Beckley*

*Newspapers Corp. v. Hanks*, 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967) (per curiam); *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *Greenbelt Cooperative Publishing Ass'n v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970); *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971); *Time, Inc. v. Pape*, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971); *Ocala Star-Banner Co. v. Damron*, 401 U.S. 295, 91 S.Ct. 628, 28 L.Ed.2d 57 (1971); *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971); *Gertz v. Robert Welch, Inc., supra*. The court further extended the free speech protection accorded by the *New York Times* privilege to statements made in the context of labor disputes. *Linn v. United Plant Guard Workers of America, Local 114*, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), and *Old Dominion Branch No. 496, National Association of Letter Carriers, AFL–CIO v. Austin*, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) (*Letter Carriers v. Austin*). The *New York Times* privilege has also been applied in situations other than libel. *See Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1966) (invasion of privacy), and *Cantrell v. Forest City Publishing Co.*, 419 U.S. 245, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974) (invasion of privacy); *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (dismissal of public employees).

Thus, we approach the task before us mindful that "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana, supra* at 74–75, 85 S.Ct. at 216. The constitutional guarantee of freedom of the press is "not for the benefit of the press so much as for the benefit of all of us [, for a] broadly defined freedom of the press assures the maintenance of our political system and an open society." *Time, Inc. v. Hill, supra* at 389, 87 S.Ct. at 543.

### III

■ The constraints placed on the scope of defamation liability by the *New York*

*Times* rule have been extended to the context of libel actions by public figures. *Gertz v. Robert Welch, Inc., supra; Curtis Publishing Co. v. Butts, supra.*

> Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures . . . may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth. [*Gertz,* 418 U.S. at 342, 94 S.Ct. at 3008.]

Hence, proof of defamation and falsity alone affords an insufficient basis for recovery by public figure libel plaintiffs. Rather, such plaintiffs must prove publication with "actual malice" by "clear and convincing proof" in order to establish the defendant's liability.

The underlying basis for the *Gertz* Court's delimitation of such a narrow zone of legal protection from reputational injury for public figures is twofold: (1) such persons have assumed the increased risk of harm to reputation by their voluntary involvement in public affairs, and (2) their "significantly greater access to the channels of effective communication" affords them "available opportunities to contradict the lie or correct the error and thereby to minimize its adverse impact on reputation." 418 U.S. at 344, 94 S.Ct. at 3009. *See* Note, *Public Figures, Private Figures and Public Interest,* 30 Stan.L.Rev. 157 (1977); Note, *The Supreme Court, 1973 Term,* 88 Harv.L.Rev. 41, 139–48 (1974).

Thus, in order to succeed in this action, it is incumbent on appellant—a public figure—to prove that the allegedly defamatory statement was published by appellees with actual malice.

■ The actual malice concept has been the subject of exposition in several Supreme Court opinions, and is by now rather well-defined. Actual malice, in the constitutional sense, differs dramatically from the pre-*New York Times* concept. The traditional common law definition of malice equated it with bad or corrupt motive, spite, ill will, general hostility, intention to injure, or hatred. However, publication with these motives alone does not satisfy the *New York Times* standard, and actual malice can never be inferred from the mere presence of such factors. *Letter Carriers v. Austin,* 418 U.S. at 281, 94 S.Ct. 2770; *Greenbelt Cooperative Publishing Ass'n v. Bresler,* 398 U.S. at 10, 90 S.Ct. 1537; *Beckley Newspapers Corp. v. Hanks,* 389 U.S. at 82, 88 S.Ct. 197; *Rosenblatt v. Baer,* 383 U.S. at 84, 86 S.Ct. 669; *Garrison v. Louisiana,* 379 U.S. at 73, 85 S.Ct. 209. Rather, the *New York Times* rule of actual malice redirects the focus of inquiry from the common law's emphasis on the defendant's attitude toward the plaintiff as the animus for defamatory publication to the defendant's attitude toward the truth or falsity of the content of such a publication. *See Cantrell v. Forest City Publishing Co.,* 419 U.S. at 252, 95 S.Ct. 465; *Time, Inc. v. Hill,* 385 U.S. at 396 n.12, 87 S.Ct. 584.

In *Garrison v. Louisiana, supra,* the Court distinguished between the "reckless-disregard-of-truth" component of the *New York Times* standard and negligence as a basis of defamation liability. The Court rejected the argument that the *New York Times* standard contemplated punishment for false statements not made in the reasonable belief of their truth ("reasonable belief" being defined as one which " 'an ordinarily prudent man might be able to assign a just and fair reason for' ", 379 U.S. at 79, 85 S.Ct. at 218). This test was deemed unacceptable because of its suggestion that immunity from liability

> disappears on proof that the exercise of ordinary care would have revealed that the statement was false. The test which we laid down in *New York Times* is not keyed to ordinary care; defeasance of the privilege is conditioned, not on mere negligence, but on reckless disregard for the truth. [*Id.*]

Thus, in the view of the *Garrison* Court, "only those false statements made with the high degree of awareness of their probable falsity demanded by *New York Times* may be the subject of either civil or criminal sanctions." 379 U.S. at 74, 85 S.Ct. at 216.

Thereafter, in *St. Amant v. Thompson, supra,* the Court provided its fullest explication of the *New York Times* actual malice concept. The Court began by acknowledging that " '[r]eckless disregard' . . . cannot be fully encompassed in one infallible definition. Inevitably its outer limits will be marked out through case-by-case adjudication, as is true with so many legal standards for judging concrete cases, whether the standard is provided by the Constitution, statutes, or case law." 390 U.S. at 730–31, 88 S.Ct. at 1325. The Court continued:

> These cases [*i. e., New York Times, Garrison,* and *Curtis Publishing Co.*] are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice. [390 U.S. at 731, 88 S.Ct. at 1325.]

The Court finally stated:

> The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports. [390 U.S. at 732, 88 S.Ct. at 1326 (footnote omitted).]

■ Actual malice may not be inferred from the mere fact of defamatory publication alone, *Hurley v. Northwest Publications, Inc.,* 273 F.Supp. 967 (D.Minn.1967), aff'd 398 F.2d 346 (8th Cir. 1968); from the character and content of a publication, *Washington Post Co. v. Keogh,* 125 U.S. App.D.C. 32, 36, 365 F.2d 965, 969 (1966), *cert. denied,* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967); from the inherent seriousness of a defamatory charge or accusation, *id.* 125 U.S.App.D.C. at 36–37, 365 F.2d at 969–70; or from mere investigatory failures, *St. Amant v. Thompson, supra* 390 U.S. at 733, 88 S.Ct. 1323; *New York Times, supra* 376 U.S. at 287–88, 84 S.Ct. 710; *Washington Post Co. v. Keogh, supra* 125 U.S.App.D.C. at 39–40, 365 F.2d at 972–73. Publication with actual malice may never be presumed, *New York Times, supra* 376 U.S. at 284, 84 S.Ct. 710, but is a matter of proof as to each defendant, *Phoenix Newspapers, Inc. v. Church,* 24 Ariz.App. 287, 537 P.2d 1345, 1358–61 (1965), by "clear and convincing" evidence. *Gertz, supra* 418 U.S. at 342, 94 S.Ct. 2997.[5]

## IV

We turn now to a consideration of application of the *New York Times* libel rule in the context of summary judgment. We begin with a review of traditional summary judgment principles.

■ Summary judgment may be granted in an action "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Super.Ct.Civ.R. 56(c); *Burch v. Amsterdam Corp.,* D.C.App., 366 A.2d 1079, 1083–84 (1976); *Yates v. District Credit Clothing, Inc.,* D.C.App., 241 A.2d

5. As postulated by the Supreme Court, the actual malice test erects a formidable barrier to recovery to the public figure-public official class of defamation plaintiffs. Few such plaintiffs have successfully met this rigorous standard of proof. *See, e. g.,* cases cited in *Eaton, supra* at 1375 n. 113.

596, 598 (1968). The burden of demonstrating "the absence of any factual issue" is borne by the moving party. *Burch v. Amsterdam Corp., supra* at 1084; *Yates v. District Credit Clothing, Inc., supra* at 598. To survive the summary judgment motion, "the opposing party need only show that there is sufficient evidence supporting the claimed factual dispute to require a jury or judge to resolve the parties' differing versions of the truth at trial." *International Underwriters, Inc. v. Boyle,* D.C.App., 365 A.2d 779, 782 (1976).

■ The court's role, therefore, is not "to resolve any fact issues", *id.* at 782, but rather merely to see if "the record . . demonstrate[s] that there is no issue of fact from which a jury could find" for the nonmoving party. *Time, Inc. v. McLaney,* 406 F.2d 565, 567 (5th Cir.), *cert. denied,* 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969).

■ Since the moving party carries the burden of proving no genuine issue of fact in dispute, "the material lodged in support of the motion must be viewed in the light most favorable to the opposing party." *International Underwriters, Inc. v. Boyle, supra* at 782; *Adickes v. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). If the offered evidence and its inferences would *permit* the factfinder to hold for the nonmoving party under the appropriate *burden of proof, the motion for* summary judgment should be denied. The burden of proof varies with the nature of the civil action being litigated. For example, in a negligence action, plaintiff at trial must prove each element of the claim by a preponderance of the evidence, *see Danzansky v. Zimbolist,* 70 App.D.C. 234, 105 F.2d 457 (1939), and in an action for fraud, plaintiff must prove each element of the claim by clear and convincing evidence. *Bennett*

*v. Kiggins,* D.C.App., 377 A.2d 57 (1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978). However, regardless of the nature of the civil action, the function of the trial court remains the same when ruling on a motion for summary judgment. "Where . . . it is plain that the record has been fully developed by depositions and affidavits on a motion for summary judgment, and such record demonstrates that, construing all of the facts and inferences to be drawn therefrom in favor of the party against whom the judgment is entered, he would not be entitled to have a jury verdict stand, we have not hesitated to hold that the grant of summary judgment is proper. [*Time, Inc. v. McLaney, supra* at 571–72].

■ In sum, a motion for summary judgment should be granted if (1) taking all reasonable inferences in the light most favorable to the nonmoving party, (2) a reasonable juror, acting reasonably, *could not* find for the nonmoving party, (3) under the appropriate burden of proof.[6] This test requires the trial judge to view the case propounded by the party opposing the motion for summary judgment and to determine, from that perspective, whether that party's case is adequate. If the facts, construed in a light most favorable to the party opposing the motion, and the inferences from those facts, would not entitle the party opposing the motion to have a favorable jury verdict sustained, then the motion should be granted.

Proper utilization of the summary judgment tool facilitates the orderly process of judicial administration. Because it operates pretrial, summary judgment provides an effective mechanism for the prompt resolution of actions in which judgment may be rendered as a matter of law, there being no material factual dispute. It thereby avoids the needless expenditure, both by the courts and by the parties, of valuable resources in unnecessary trials, and mitigates the poten-

---

6. Indeed, the trial court employs the same procedure in several contexts such as a motion for directed verdict and a motion for a judgment notwithstanding the verdict. The court must determine if a reasonable juror, acting reasonably, could find for the nonmoving party under the applicable burden of proof. *See* 6 Moore's Federal Practice ¶ 56.04[2] at 74–76; 10 Wright & Miller, Federal Practice and Procedure: Civil § 2713, at 406–07.

tial for misuse of the legal process by a party to harass adverse parties or to coerce them into settlement. *See* 6 Moore's Federal Practice ¶ 56.04[1] at 63; 10 Wright & Miller, Federal Practice and Procedure: Civil § 2712, at 370–72.

These considerations assume greater significance in the context of public official-public figure libel actions because of their potential for infringement on First Amendment freedoms. In a leading libel case, *Washington Post Co. v. Keogh, supra,* the United States Court of Appeals for the District of Columbia observed in this regard:

> In the First Amendment area, summary procedures are even more essential. For the stake here, if harassment succeeds, is free debate. One of the purposes of the *Times* principle, in addition to protecting persons from being cast in damages in libel suits filed by public officials, is to prevent persons from being discouraged in the full and free exercise of their First Amendment rights with respect to the conduct of their government. The threat of being put to the defense of a lawsuit brought by a popular public official may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself, especially to advocates of unpopular causes. All persons who desire to exercise their right to criticize public officials are

not . . . well equipped financially . . . to defend against a trial on the merits. Unless persons, including newspapers, desiring to exercise their First Amendment rights are assured freedom from the harassment of lawsuits, they will tend to become self-censors. And to this extent debate on public issues and the conduct of public officials will become less uninhibited, less robust, and less wide-open, for self-censorship affecting the whole public is "hardly less virulent for being privately administered." [124 U.S.App.D.C. at 35, 365 F.2d at 968 (citation omitted).]

*See* 10 Wright & Miller, *supra,* § 2730 at 592.

Disposing of these types of libel actions at summary judgment cures what Professor Anderson has recognized as "[t]he serious deficiency" of the *New York Times* privilege: "that it operates too late in the litigation process." Anderson, *supra* at 456. He argues that application of the privilege near the outset of libel litigation better accomplishes the paramount purpose of the privilege—enhancement of public debate through reduction of the incentives for less self-censorship inherent in the threat posed by potential defamation liability—and protects both libel plaintiffs and defendants from investment in expensive litigation. *Id.* at 437. Nevertheless, while courts[7] and

---

**7.** Both the relevant state and federal case law manifest a judicial policy of liberal utilization of the summary judgment procedure for early disposition of libel actions having First Amendment implications. Thus, where libel plaintiffs have failed *to produce evidence from which a jury could find* that publication with reckless disregard for truth or falsity has been established by clear and convincing proof, summary judgment has been granted for the defendants. *Meeropol v. Nizer,* 560 F.2d 1061, 1064–66 (2d Cir. 1977), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978); *Walker v. Cahalan,* 542 F.2d 681, 684 (6th Cir. 1976), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1647, 52 L.Ed.2d 357 (1977); *Anderson v. Stanco Sports Library, Inc.,* 542 F.2d 638 (4th Cir. 1976); *Perry v. Columbia Broadcasting System, Inc.,* 499 F.2d 797, 799–800 (7th Cir.), *cert. denied,* 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974); *Cervantes v. Time, Inc.,* 464 F.2d 986 (8th Cir. 1972), *cert. denied,* 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973); *Treutler v. Meredith Corp.,* 455 F.2d 255 (8th Cir. 1972); *Gospel Spreading Church v. Johnson Publishing Co.,* 147 U.S.App.D.C. 207, 454 F.2d 1050 (1971); *Cerrito v. Time, Inc.,* 449 F.2d 306 (9th Cir. 1971); *Time, Inc. v. Johnston,* 448 F.2d 378 (4th Cir. 1971); *Miller v. News Syndicate Co.,* 445 F.2d 356 (2d Cir. 1971); *Medina v. Time, Inc.,* 439 F.2d 1129 (1st Cir. 1971); *Dacey v. Florida Bar, Inc.,* 427 F.2d 1292 (5th Cir. 1970); *Bon Air Hotel, Inc. v. Time, Inc.,* 426 F.2d 858 (5th Cir. 1970); *Time, Inc. v. McLaney, supra;* *United Medical Laboratories, Inc. v. Columbia Broadcasting System, Inc.,* 404 F.2d 706 (9th Cir. 1968), *cert. denied,* 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969); *Thompson v. Evening Star Newspaper Co.,* 129 U.S.App.D.C. 299, 394 F.2d 774, *cert. denied,* 393 U.S. 884, 89 S.Ct. 194, 21 L.Ed.2d 160 (1968); *Walker v. Pulitzer Publishing Co.,* 394 F.2d 800 (8th Cir. 1969); *Washington Post Co. v. Keogh, supra;* *Hoffman v. Washington Post Co.,* 433 F.Supp.

commentators have emphasized the utility of summary judgment in First Amendment libel cases, the Supreme Court has recently sounded a note of caution in this area. The Court recognized that "proof of 'actual malice' calls a defendant's state of mind into question, *New York Times v. Sullivan*, 376 U.S. 254 [84 S.Ct. 710, 11 L.Ed.2d 686] (1964), and does not readily lend itself to summary disposition." *Hutchinson v. Proxmire*, —— U.S. ——, —— n.9, 99 S.Ct. 2675, 2680 n.9, 61 L.Ed.2d 411 (1979). *See Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). *See generally, Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). Because of the compelling First Amendment interest at stake, we regard summary judgment as a useful method of disposing of constitutional libel actions— *where appropriate.*

The crux of the case before us is the correctness of the procedure utilized by the trial court in ruling on the appellee's motion for summary judgment. All the parties concede that under the applicable substantive law, a public figure libel plaintiff must present clear and convincing proof of actual malice in order to prevail at trial. *Gertz, supra,* 418 U.S. at 342, 94 S.Ct. 2997. What the parties vigorously contest is the requisite showing a public figure libel plaintiff must make to defeat a motion for summary judgment. Thus, the focus of the issue presented herein is the standard used by the trial court in reviewing the appellee's motion. The trial court stated the standard it applied as follows:

> In considering a motion for summary judgment, the first task of the Court is the determination of whether there exist any genuine issues of material fact, Rule 56(c), Civil Rules of the Superior Court.

To demonstrate the existence of such issues, a public figure plaintiff in a libel action must show that the evidence and permissible inferences, when viewed as favorably as possible for the plaintiff, establish with convincing clarity that the defendants acted with actual malice.

The trial court thus appears to have held that after viewing the evidence in its light most favorable to the plaintiff, the court must be convinced that actual malice has been proven with convincing clarity to defeat a motion for summary judgment. Finding that the evidence failed to meet that standard, the trial court granted summary judgment for appellees.

Appellees argue that the trial court was correct in ruling that, on a defendant's motion for summary judgment, a public figure libel plaintiff must prove actual malice with convincing clarity to the trial judge in the first instance in order to demonstrate the existence of a genuine issue for trial. Conceding that this is not normal summary judgment procedure, appellees maintain that compliance with this procedure is constitutionally mandated by the *New York Times* rule and is consistent with the policy enunciated in *Keogh* favoring early resolution of libel cases. Moreover, because modern discovery rules afford plaintiffs ample opportunity to probe for evidence, early disposition of libel cases does not work a disadvantage to such plaintiffs in the development of the merits of their cases.

Appellant contends that the standard of review enunciated by the trial court is erroneous in that it requires a public figure libel plaintiff to prove actual malice to the trial judge before he may prove it to the jury. Appellant further contends that this requirement is neither proper under the traditional summary judgment proceeding nor

600 (D.D.C.1977), aff'd mem., 188 U.S.App.D.C. 200, 578 F.2d 442 (1978); *Martin Marietta Corp. v. Evening Star Newspaper Co.,* 417 F.Supp. 947 (D.D.C.1976); *Buchanan v. Associated Press,* 398 F.Supp. 1196 (D.D.C.1975); *Alpine Construction Co. v. Demaris,* 358 F.Supp. 422 (N.D.Ill.1973); *LaBruzzo v. Associated Press,* 353 F.Supp. 979 (W.D.Mo.1973); *Kent v. Pittsburgh Press Co.,* 349 F.Supp. 622 (W.D.Pa. 1972); *Phoenix Newspapers, Inc. v. Church,*

*supra* ; *Woolbright v. Sun Communications, Inc.,* 480 S.W.2d 864 (Mo.1972); *Barbetta Agency, Inc. v. Evening News Publishing Co.,* 135 N.J.Super. 214, 343 A.2d 105 (1975); *Trails West, Inc. v. Wolff,* 32 N.Y.2d 207, 344 N.Y. S.2d 863, 298 N.E.2d 52 (1973); *Cline v. Brown,* 24 N.C.App. 209, 210 S.E.2d 446 (1974), *cert. denied,* 286 N.C. 412, 211 S.E.2d 793 (1975); *Washington v. World Publishing Co.,* 506 P.2d 913 (Okl.1973).

mandated by *New York Times*. According to appellant, the standard as set forth by the trial court requires that a public figure libel plaintiff effectively prove his case at least twice and perhaps as many as four times in the trial court: (1) at summary judgment; (2) at the close of the plaintiff's case; (3) at the close of all the evidence; and (4) at post-trial defense motions in the event of a plaintiff verdict. Appellant contends that such a procedure permits the trial court to invade the traditional province of the jury as factfinder and thus constitutes an impermissible infringement on his Seventh Amendment right to a jury trial. By adopting the rigorous requirement of clear and convincing proof of malice, he maintains, the Supreme Court did not intend to disturb the traditional allocation of functions between the court as expounder of law and the jury as factfinder. In sum, appellant concludes that the normal summary judgment procedures apply in public figure libel actions.

Although the cases are legion in which libel claims have been decided at summary judgment,[8] our research reveals nonetheless that there are conflicting views on the precise procedure to be used by the trial court at the summary judgment stage. These conflicting views stem from differing interpretations of the Supreme Court's directive in *New York Times v. Sullivan* :

> In cases where that line [between protected and nonprotected speech] must be drawn, the rule is that we "examine for ourselves the statements in issue and the circumstances under which they were made to see * * * whether they are of a character which the principles of the First Amendment . . . protect." . . . We must "make an independent examination of the whole record" . . so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression. [376 U.S. at 285, 84 S.Ct. at 729 (citations and footnotes omitted).][9]

8. *See* note 7 *supra*.

9. *See also Time, Inc. v. Pape*, 401 U.S. at 284, 91 S.Ct. 633; *Greenbelt Cooperative Publishing*

Courts have used this directive in cases involving First Amendment defenses to argue that, in determining whether the plaintiff has sustained his burden at summary judgment, the trial court, after making an independent examination of the evidence, must be convinced that there has been a showing of actual malice with convincing clarity. In making this examination, the argument follows, the court must weigh the evidence, draw reasonable inferences, and assess the credibility of witnesses. Such a view was expounded in a concurring opinion in *Wasserman v. Time, Inc.*, 138 U.S.App. D.C. 7, 9–10, 424 F.2d 920, 922–23, *cert. denied*, 398 U.S. 940, 90 S.Ct. 1844, 26 L.Ed.2d 273 (1970), where Circuit Judge (now Chief Judge) J. Skelly Wright outlined what he deemed to be the proper procedure for resolution of the actual malice issue:

> In my judgment *New York Times Co. v. Sullivan* makes actual malice a constitutional issue to be decided in the first instance by the trial judge applying the *Times* test of actual knowledge or reckless disregard of the truth. . . . Unless the court finds, on the basis of pretrial affidavits, depositions or other documentary evidence, that the plaintiff can prove actual malice in the *Times* sense, it should grant summary judgment for the defendant. . . .

> If the case survives the defendant's summary judgment motion, the trial court at the close of the plaintiff's case must decide whether actual malice has been shown with "convincing clarity." In making this judgment the court will judge the credibility of the witnesses and draw its own inferences from the evidence. If the trial is permitted to proceed, the court will be called upon again to make a judgment on the actual malice issue at the close of all the evidence. If the motion for a directed verdict at this stage of the trial is denied, the actual

*Ass'n v. Bresler*, 398 U.S. at 11, 90 S.Ct. 1537 (reaffirming appellate court review function in this area); *Beckley Newspapers Corp. v. Hanks*, 389 U.S. at 82–83, 88 S.Ct. 197.

malice issue, along with the other issues, is then submitted to the jury under the *Times* instruction without any indication from the court or counsel that the court has decided that the evidence shows actual malice with "convincing clarity." [138 U.S.App.D.C. at 9, 424 F.2d at 922 (footnotes and citations omitted).] [10]

In Judge Wright's view, First Amendment free press considerations necessitate a departure from normal summary judgment procedures in two distinct ways. First, rather than view this evidence in a light most favorable to the plaintiff, Judge Wright would have the trial judge evaluate all the evidence in its most reasonable light. Second, rather than ask whether a reasonable jury could find actual malice with convincing clarity, Judge Wright would require the trial judge to find actual malice with convincing clarity if plaintiff is to survive a summary judgment attack. The *Wasserman* approach thus constitutes a two-prong departure from normal summary judgment law.

An examination of public figure libel cases subsequent to the *Wasserman* decision reveals that the specialized procedure for the handling of public figure libel cases suggested in *Wasserman* has met with mixed results in other cases. *See Fadell v. Minneapolis Star & Tribune Co.,* 557 F.2d 107 (7th Cir.), *cert. denied,* 434 U.S. 966, 98 S.Ct. 508, 54 L.Ed.2d 452 (1977); *Bon Air Hotel, Inc. v. Time, Inc.,* 426 F.2d 858 (5th Cir. 1970); *Hoffman v. Washington Post Co.,* 433 F.Supp. 600 (D.D.C.1977), *aff'd mem.,* 188 U.S.App.D.C. 200, 578 F.2d 442 (1978); *Oliver v. Village Voice, Inc.,* 417 F.Supp. 235, 237 (S.D.N.Y.1976); *Martin Marietta Corp. v. Evening Star Newspaper Co.,* 417 F.Supp. 947 (D.D.C.1976); *Buchanan v. Associated Press,* 398 F.Supp. 1196 (D.D.C.1975); *Lewis v. Reader's Digest Ass'n,* 366 F.Supp. 154 (D.Mont.1973); *Curran v. Philadelphia Newspapers, Inc.,* —— Pa.Super. ——, 395 A.2d 1342 (1978).

A second view of the procedure the trial court should use in libel actions is found in *Guam Federation of Teachers, Local 1581 v.*

*Ysrael,* 492 F.2d 438 (9th Cir.), *cert. denied,* 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974). In that case, a libel action brought by a union and seven of its officers, all public figures, the trial court granted the defendant's motion for a directed verdict after presentation of the plaintiffs' case at trial to a jury. The Court of Appeals reversed. Although that case involved a motion for a directed verdict after presentation of the plaintiff[s'] case at trial, the theory underlying a directed verdict and summary judgment is sufficiently analogous that we may properly consider the views expressed by the Ninth Circuit therein in our analysis. *See* note 6, *supra.*

The *Guam* court acknowledged that the presence of First Amendment considerations in libel actions necessitated closer judicial scrutiny of the evidence adduced by plaintiffs in summary judgment, directed verdict, and judgment notwithstanding the verdict procedures. However, it rejected the *Wasserman* thesis that a trial court, weighing the evidence and drawing reasonable inferences therefrom, must first determine whether actual malice is demonstrated with "convincing clarity" before the case can proceed to the jury. The court stated:

> We think that in a libel case, as in other cases, the party against whom a motion for summary judgment, a motion for a directed verdict, or a motion for a judgment notwithstanding the verdict is made is entitled to have the evidence viewed in the light most favorable to him and to all inferences that can properly be drawn in his favor by the trier of fact. We think, too, that in such cases it is not only not the duty of the judge, or of this court of appeal, to weigh the credibility of the evidence, or to draw inferences in favor of the moving party (except, of course, when no contrary inference can legitimately be drawn), but that neither the judge nor this court on appeal has the authority to weigh credibility or to choose among legitimate inferences in such cases.

10. Judge Spottswood W. Robinson III, concurred in Judge Wright's opinion.

The *standard* against which the evidence must be examined is that of *New York Times* and its progeny. But the *manner* in which the evidence is to be examined in the light of that standard is the same as in all other cases in which it is claimed that a case should not go to the jury. If the evidence, so considered, measures up to the *New York Times* standard, the case is one for the jury, and *it is error to grant a directed verdict*, as the trial judge did in this case. [492 F.2d at 441 (emphasis in original).] [11]

The import of the *Guam* decision is that the usual procedural rules should govern summary judgment and that a libel plaintiff need not prove malice twice—first to the judge, then to the jury. According to this view the function of the trial court on such a motion is not to weigh proof and make independent findings, but rather to determine whether or not the plaintiff has demonstrated a genuine issue of material fact from which a jury, using the appropriate burden of proof—"clear and convincing" evidence—*could find* publication of a defamatory falsehood with actual malice.

A third view on the question under consideration has been suggested by the Supreme Court of Washington. In *Chase v. Daily Record, Inc.,* 83 Wash.2d 37, 515 P.2d 154 (1973) (en banc), the court reversed the trial court's grant of summary judgment for a defendant in a libel action brought by a county commissioner. The court discussed the issue of a public official libel plaintiff's burden of proof as to the issue of malice at the summary judgment stage. In the court's view, the function of the trial judge at summary judgment in libel actions does not differ from that which the judge performs in other civil actions. On such a motion in libel actions, the trial court's role is the limited one of determining the existence of a material factual dispute (from which reasonable inferences supportive of a jury finding of malice could be drawn); it does not encompass the resolution of factual disputes. 515 P.2d at 157.

However, in recognition of the First Amendment impact of defamation actions brought by public officials, the *Chase* court held that the summary judgment procedure in such actions should operate as a more effective buffer between the exercise of free speech-free press guarantees and the threat of defamation liability.

Thus the court adopted a rule requiring that such libel plaintiffs establish a "prima facie" case at summary judgment in order to advance to the jury:

In defamation actions by public officials, although the summary judgment procedure is basically the same, we are convinced the decisions of the United States Supreme Court have added a new facet, measurement, or dimension which must now be considered and resolved by the trial courts. [I]n such defamation actions, if the trial judge at the *summary judgment stage* determines that the plaintiff has offered evidence of *a sufficient quantum to establish a prima facie case,* and the offered evidence *can be equated with the standard or test of "convincing clarity"* prescribed by United States Supreme Court decisions, the motion for summary judgment should be denied. [515 P.2d at 157–58 (footnote and citation omitted) (emphasis in original).]

*Accord, Adams v. Frontier Broadcasting Co.,* 555 P.2d 556 (Wyo.1976) (adopting the *Chase* standard).

At first blush it would appear that the rule articulated by the Washington Supreme Court sets forth a new principle controlling summary judgment procedure in

---

11. *Accord, Maheu v. Hughes Tool Co.,* 569 F.2d 459, 464 (9th Cir. 1978); *Dixson v. Newsweek, Inc.,* 562 F.2d 626, 631 (10th Cir. 1977); *Alioto v. Cowles Communications, Inc.,* 519 F.2d 777, 780 (9th Cir.), *cert. denied,* 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 259 (1975); *Phoenix Newspapers, Inc. v. Church, supra; Dacey v. Connecticut Bar Ass'n,* 170 Conn. 520, 368 A.2d 125, 135–36 (1976); *Bandelin v. Pietsch,* 98 Idaho 337, 563 P.2d 395, 398–99, *cert. denied,* 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 177 (1977); *Cochran v. Indianapolis Newspaper, Inc.,* Ind.App., 372 N.E.2d 1211, 1222–23 (1978); *Stone v. Essex County Newspapers, Inc.,* 367 Mass. 849, 330 N.E.2d 161, 175 & n.11 (1975).

constitutional defamation actions that is distinct from—and perhaps more rigorous than—that which is operative in "run-of-the-mill lawsuits." 515 P.2d at 157. However, upon closer scrutiny, we think it is apparent that the *Chase* standard is functionally equivalent to the normal summary judgment test.

The term "prima facie case" is a technical term which traditionally has been used with reference to the allocation of "burden of proof" between litigants in legal actions. The general rule is that a party asserting or pleading an issue has the burden of proof—*i. e.,* burden of persuasion—and its constituent burden of production—*i. e.,* the initial burden of going forward with evidence—as to each material element of such issue in order to prevail. 31A C.J.S. *Evidence* § 104 at 168 (1964). A party satisfies his burden of production with respect to an issue material to his case when he has made out a "prima facie" case as to such issue—*i. e.,* a sufficient quantum of evidence which, if credited, would permit judgment in his favor unless contradicted by credible evidence offered by the opposing party. *Bailey v. Zlotnick,* 77 U.S.App. D.C. 84, 85, 133 F.2d 35, 36 (1942) (motion for directed verdict). The establishment of a prima facie case by the party bearing the burden of persuasion as to an issue shifts the burden of producing contradictory evidence to the adverse party. The burden of evidentiary production shifts from side to side during the course of the trial as each party introduces evidence sufficient to satisfy the test. *See generally,* 31A C.J.S. *Evidence, supra,* § 110 at 184–88.

The same rules are applicable in a motion for summary judgment. On such motion the well-settled rule is that the moving party bears the burden of proving that no genuine issue as to any material fact exists and that he is entitled to judgment as a matter of law. The movant may discharge his burden of proof by demonstrating that if the case proceeded to trial his opponent could produce no competent evidence to support a contrary position. 10 Wright & Miller, *supra,* § 2727, at 531. A

prima facie showing by the movant for summary judgment—*i. e.,* the production of enough evidence to demonstrate such party's entitlement to a judgment if evidence were uncontroverted at trial—shifts the burden of producing evidence to the party opposing the motion. Summary judgment should be granted to the movant unless the opposing party offers competent evidence admissible at trial showing that there is a genuine issue as to a material fact. *Id.* at 536–37.

Once the movant has made the requisite showing,

> the issue of material fact required by Rule 56(c) to be present to entitle [the opposing] party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial. [*First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968).]

In practical effect, this rule requires more of the opposing party than the mere demonstration of disputed factual issues. *Bushie v. Stenocord Corp.,* 460 F.2d 116, 119 (9th Cir. 1972). "[T]he showing of a 'genuine issue for trial' is predicated upon the existence of a legal theory which remains viable under the asserted version of the facts, and which would entitle the party opposing the motion (assuming his version to be true) to a judgment as a matter of law." *McGuire v. Columbia Broadcasting System, Inc.,* 399 F.2d 902, 905 (9th Cir. 1968). A plaintiff opposing a defense motion for summary judgment, in order to make the evidentiary showing that will permit him to advance to trial must "show that he has a plausible ground for the maintenance of the cause of action." *Horne v. Federal Reserve Bank of Minneapolis,* 344 F.2d 725, 729 (8th Cir. 1965); *Repsold v. New York Life Insurance Co.,* 216 F.2d 479, 483 (7th Cir. 1954); *Pen-Ken Gas & Oil Corp. v. Warfield Natural Gas Co.,* 137 F.2d 871, 877 (6th Cir. 1943).

Such party in essence must produce enough evidence to make out a prima facie case in support of his claim.

Hence, to say that libel plaintiffs opposing a defense motion for summary judgment must establish a prima facie case in order to defeat the motion, as the *Chase* rule states, appears to impose no greater burden on such plaintiffs than they are normally required to meet. The *Chase* rule seems to be simply a restatement of the normal standard with which a party opposing summary judgment must comply. We equate the *Chase* principle with the *Guam* principle—there appears to be, at best, a "distinction without a difference" between normal summary judgment doctrines and the "prima facie" doctrine enunciated in *Chase.*

■ We are unpersuaded by Judge Wright's two-pronged approach or by other courts' variations upon it. We feel either prong of the *Wasserman* procedure—and perforce both prongs in conjunction—impermissibly denigrates the traditional roles of judge and jury. Furthermore, we glean from *New York Times* and subsequent decisions that the Court envisions normal function of the jury in libel actions as in other civil actions. *See Wolston v. Reader's Digest Ass'n,* —— U.S. ——, —— n.3, 99 S.Ct. 2701, 2704, n.3, 61 L.Ed.2d 450 (1979); *Hutchinson v. Proxmire, supra* —— U.S. at —— n.9, 99 S.Ct. at 2680, n.9; *St. Amant v. Thompson,* 390 U.S. at 732, 88 S.Ct. 1323; *Beckley Newspapers Corp. v. Hanks,* 389 U.S. at 84–85, 88 S.Ct. 197; *Time, Inc. v. Hill,* 385 U.S. at 391, 87 S.Ct. 534; *Rosenblatt v. Baer,* 383 U.S. at 87, 86 S.Ct. 669. Thus, we are of the opinion that at summary judgment the plaintiff is not required to prove to the court "actual malice with convincing clarity" as he must do at trial because that would of necessity require a weighing of evidence by the court. We find no hint anywhere from the Supreme Court, that the judge must himself be convinced. Rather, we are in agreement with the *Guam* court, that the plaintiff need only present evidence which shows a genuine issue of material fact from which a reasona-

ble jury *could find* actual malice with convincing clarity.

Although the Supreme Court has stated that protection of First Amendment freedoms may require special safeguards in these types of actions, those safeguards are embodied in the rather exacting standard of clear and convincing proof of actual malice. As the Supreme Court observed in *Gertz*:

This standard [of clear and convincing proof of malice] administers an extremely powerful antidote to the inducement to media self-censorship of the common-law rule of strict liability for libel and slander. And it exacts a correspondingly high price from the victims of defamatory falsehood. [418 U.S. at 342, 94 S.Ct. at 3008.]

The *Times* standard which requires proof of actual malice—deliberate falsification or reckless disregard for the truth—with convincing clarity, itself intermediate between the normal "preponderance of the evidence" civil standard and the "beyond the reasonable doubt" criminal standard, imposes a heavier burden of proof on a plaintiff in these actions than in the usual civil action. *See* footnote 5 *supra.* This standard determines the materiality of disputed issues of fact. There must be proof from which a reasonable jury acting reasonably *could* find actual malice by *clear and convincing evidence* before a plaintiff can survive summary judgment. If there are disputed facts which if resolved in the plaintiff's favor would not establish actual malice with convincing clarity, then they are not material and judgment will be granted for the defendant. *Bandelin v. Pietsch,* 98 Idaho 337, 563 P.2d 395, 399 (1977). *See Guam Federation of Teachers, Local 1581 v. Ysrael, supra; Time, Inc. v. McLaney, supra.*

■ Thus, while we agree that the First Amendment requires a public figure libel plaintiff to bear a heavier burden than is required for most other civil plaintiffs and concur in the underlying thesis of *Keogh* and *Wasserman* that the summary judgment proceeding may properly serve as a focal point for the resolution of libel actions, we are convinced that the special

protection afforded press defendants in public figure libel actions does not necessitate a dilution of the Seventh Amendment by skewing the roles of judge and jury in summary judgment proceedings. It is engrained in American jurisprudence that the court may not resolve issues of fact or weigh evidence at the summary judgment stage in normal circumstances. We hold that the same principles applicable to normal summary judgment motions are applicable to such motions when made in a public figure libel action. *See Guam Federation of Teachers, Local 1581 v. Ysrael, supra* at 441–43; *Time, Inc. v. Ragano,* 427 F.2d 219, 221 (5th Cir. 1970); *Hotchner v. Castillo-Puche,* 404 F.Supp. 1041, 1050 (S.D.N.Y. 1975); *Maloney & Sons, Inc. v. E. W. Scripps Co.,* 43 Ohio App.2d 105, 334 N.E.2d 494, 499, *cert. denied,* 423 U.S. 883, 96 S.Ct. 151, 46 L.Ed.2d 111 (1975). The question to be answered by the trial court must and will remain the same—Is there a genuine issue of material fact from which a reasonable jury acting reasonably could find actual malice with convincing clarity? Thus, the court examines the evidence, taking all permissible inferences and resolving questions of credibility in plaintiff's favor to determine whether *a reasonable jury acting reasonably could find actual malice with convincing clarity.* The question to be resolved at summary judgment is whether plaintiff's proof is sufficient such that a reasonable jury could find malice with convincing clarity, *and not whether the trial judge is convinced of the existence of actual malice.*

## V

Appellees de Toledano and Copley Press moved separately for summary judgment on the ground that appellant could not demonstrate publication of the allegedly libelous column with actual malice. We consider the trial court's grant of summary judgment as to each of the defendant-appellees in turn.

### A. *Appellee Ralph de Toledano*

Appellee's claim on the motion for summary judgment, renewed now on appeal, is that the statement in the January 1975 column giving rise to this action—*i. e.,* that Senator Ribicoff demonstrated in the subcommittee report that appellant falsified and distorted evidence to make his case against the Corvair—represents a legitimate interpretation of the gist of this lengthy government document, and thus was protected by the *New York Times* privilege. *Time, Inc. v. Pape, supra.* Consequently, he says, he was entitled to judgment as a matter of law.

Appellee's deposition and affidavit reveal that prior to writing the column at issue, he authored a book about appellant entitled Hit & Run: The Rise and Fall of Ralph Nader. Before writing the book he did a "tremendous amount of reading and research" on appellant for a period of six months. The Ribicoff report was among the source materials used in preparation of the book. By the time he wrote the January 1975 column, he had read the report many times, and consulted it when he wrote the column.

He stated then, as he alleges now, that the statement at issue here was based on his reading of the entire Ribicoff report, and was also "conditioned on" other characterizations of the report which he had read (*e. g.,* an article published in Barron's on September 24, 1973, written by Barron's editor Robert Bleiberg, and appellant's response thereto and a further commentary by Bleiberg on appellant's response, both of which appeared in the March 23, 1974 issue of Barron's). Thus, according to appellee, his statement reflects a summation of the report which was based on his interpretation of the "cumulative effect" of its totality. The body of the report, he maintains, is reasonably susceptible to a number of possible interpretations regarding appellant's conduct of his anti-Corvair campaign, despite the subcommittee's introductory statement that appellant had acted in good faith in making the charges against GM and the Corvair. The presence of this "good faith" finding when viewed in the context of the complete document, he asserts, at most demonstrated that his interpretation of the

document was an error in judgment. It does not negate the inference that appellant falsified and distorted evidence which he drew from the report's entire text. His statement, he avers, reflects a deliberate and a rationally defensible choice among a range of possible rational interpretations. Adoption of a rational explication of an ambiguous document, even if erroneous, does not constitute clear and convincing evidence sufficient to support a judgment of publication with actual malice. *Time, Inc. v. Pape, supra.* If, in fact, the report can reasonably be construed in the manner adopted in the column, and he honestly believed in the accuracy and veracity of this characterization of the document, he declares, any inference of publication of the statement with knowledge of its falsity or with reckless disregard therefor would be precluded.

█ In opposing appellee's motion, appellant does not dispute the facts developed on the record but asserts that reasonable inferences of actual malice could be drawn therefrom and that a question for the jury to decide thereby existed. Appellant's principal contention is that an inference of malicious publication could legitimately be drawn from de Toledano's disregard of the subcommittee's "good faith" finding as to appellant's conduct. Appellant's position in this regard is two-pronged. First, appellant contends, the statement was a direct allegation by de Toledano himself that appellant had falsified and distorted, not a summation of what others had said concerning appellant. Appellee's own deposition testimony, appellant argues, gives rise to such a conclusion. In response to an inquiry as to what meaning he intended to convey by this statement, *see generally, Herbert v. Lando, supra,* de Toledano stated: "I intended to tell the reader that Mr. Nader had lied and twisted facts to make a case." De Toledano further admitted that he was aware of the subcommittee's express declaration that Nader's charges against GM and the Corvair "were made in good faith based on the information available to him" when he made the statement. The subcommittee's "good faith" finding with regard to appel-

lant demonstrates the falsity of the de Toledano statement that he falsified and distorted evidence, appellant contends. De Toledano's utterance of such a falsehood, in spite of his cognizance of an express conclusion to the contrary by the subcommittee, supports an inference that he published with knowledge of its falsity, according to appellant.

Secondly, appellant asserts that even if the de Toledano statement itself could be construed as a presentation of his interpretation of the report, a reasonable inference of malice may still be derived from the presence of the committee's good faith finding. Viewed as such, the fault with the de Toledano column lies in its attribution of the assertion that appellant falsified and distorted evidence to Senator Ribicoff. Because of appellee's knowledge of the committee's explicit finding to the contrary, he could not properly state that the Ribicoff subcommittee had reached such a conclusion. A knowingly false attribution of a libelous statement to another is sufficient in itself, he claims, to sustain a jury finding of actual malice.

Appellant additionally maintains that assuming the offending language is not construed as an attribution of the assertion that appellant falsified and distorted evidence to the Senator, but rather is regarded as a direct statement of de Toledano's own interpretation of the report, an inference of malice is permissible. According to appellant, given the presence of the subcommittee's "good faith" conclusion in the report, the report is not rationally susceptible to appellee's proffered interpretation, thus precluding appellee's reliance on *Time, Inc. v. Pape, supra.*

In granting summary judgment in favor of appellee, the trial court ruled that the allegedly libelous statement represented a rational interpretation of an ambiguous document and thus was privileged under *Pape.*

We disagree with this ruling, and find appellee's reliance on the *Pape* case misplaced. In that case, *Time* magazine

carried an article about a report called "Justice" that was issued in November 1961 by the United States Commission on Civil Rights. Part of the report addressed the issue of police brutality, and related specific instances of reported police violence against private citizens. One such item described the *allegations* which Monroe had made in a complaint filed in an action against Pape, Deputy Chief of Detectives in the Chicago Police Department, and other police officials charging them with violation of the Federal Civil Rights Act. The complaint recounted the events of a police encounter which Monroe alleged constituted brutality violative of his federally guaranteed civil rights. The *Time* article quoted from the Commission Report's summary of Monroe's complaint but failed to indicate that these statements were allegations asserted in a legal complaint rather than independent findings of the Commission. Pape sued *Time* for libel on the basis of the omission of the word "alleged" or "allegations" from the article.

The major flaw which the Court discerned in the *Time* article was not its mere publication of the incident itself but the attribution of the Monroe allegations "to an authoritative official source" when there had been no authoritative official determination of the merit of the charges. The omission of the word "allegation" by *Time* presented the Monroe incident as a certain fact reported by the Commission Report instead of a mere allegation. The source for the *Time* article—the Commission Report—presented a picture of police violence against ordinary citizens that rendered it newsworthy. However, in the Court's view, "the attitude of the Commission toward the factual verity of the episodes recounted was anything but straightforward." 401 U.S. at 286, 91 S.Ct. at 638. The report did not make clear whether or not the Commission believed that these incidents actually occurred. Given the ambiguous manner in which the Commission presented the accounts of the incidents, and the fact that these accounts of incidents of police brutality provided the only evidence the Commission set forth to support its subsequent

findings and recommendations, the Court stated that it was logical to conclude, as *Time* did, that "the Commission must have believed that the incidents described had in truth occurred." *Id.* at 289, 91 S.Ct. at 639. Because the Commission Report was ambiguous and susceptible to several interpretations as to the truth of the events reported, the Court concluded, "Time's conduct reflected at most an error of judgment," *id.* at 292, 91 S.Ct. at 640; its conclusion was a permissible one, given the range of inferences that were possible due to the ambiguities of the Commission Report. Thus, the Court held:

Time's omission of the word "alleged" amounted to the adoption of one of a number of possible rational interpretations of a document that bristled with ambiguities. The deliberate choice of such an interpretation, though arguably reflecting a misconception, was not enough to create a jury issue of "malice" under *New York Times.* To permit the malice issue to go to the jury because of the omission of a word like "alleged," despite the context of that word in the Commission Report and the external evidence of the Report's overall meaning, would be to impose a much stricter standard of liability on errors of interpretation or judgment than on errors of historic fact. [*Id.* at 290, 91 S.Ct. at 639.]

The subcommittee report at issue in this case differs substantially from the Civil Rights Commission study that was the subject of the *Time* article in the *Pape* case, for we cannot say *as a matter of law* that this report possesses the "bristling" ambiguity which characterized the *Pape* civil rights report. In the "Summary" which appears at the beginning of the Ribicoff report, the subcommittee sets forth the primary conclusion derived from its study—*i. e.,* that appellant's charges with regard to GM and the Corvair were not supported by the evidence gathered during the investigation, and that the subject warranted no further inquiry by the subcommittee. Shortly thereafter, also in this introductory section, appeared the subcommittee's explicit state-

ment that appellant had acted in good faith in asserting the charges which he made against the Corvair; that the evidence available to him supported his conclusions, and that it was therefore understandable how he reached his conclusions. Such an explicit, unambiguous finding in our view is inconsistent with appellee's asserted inference that appellant falsified and distorted evidence. In addition, in light of the subcommittee's express conclusion to the contrary, we do not think that an assertion that appellant falsified and distorted evidence can properly be attributed to Senator Ribicoff. "[A] publisher . . . who deliberately distorts [the] statements [of others] to launch a personal attack of his own on a public figure, cannot rely on a [First Amendment] privilege . . . . In such instances he assumes responsibility for the underlying accusations." *Edwards v. National Audubon Society, Inc.*, 556 F.2d 113, 120 (2d Cir. 1977).

As appellee suggests, the critical issue which must be resolved is whether the report is reasonably susceptible of the interpretation he advances despite the subcommittee's inclusion of this statement, for if it is, his statement is immune from defamation liability under the *Pape* principle. Upon review of the entire document, we do not think that the import of the subcommittee's good faith statement is belied by the content and tone of the body of the report. The central theme of the report as announced in the preliminary summary of the report—that appellant's GM–Corvair allegations were not supported by a preponderance of the evidence—is developed in systematic fashion throughout the report; the subcommittee's analysis demonstrates that appellant's allegations were not borne out in fact. However, the subcommittee had expressly stated that the reports, documents, and other materials which appellant possessed as to the whole GM–Corvair issue supported his contentions. The subcommittee's evaluation of the far greater volume of data amassed during its study—a large proportion of which had been unavailable to appellant—suggested different conclusions from those reached by appellant. Nowhere

is it intimated that appellant falsified and distorted evidence. We do not find that the report's basic "tone of total neutrality," established at the outset, "was frequently marred . . . by remarks that appeared to indicate . . . unexpressed views," *Time, Inc. v. Pape*, 401 U.S. at 288, 91 S.Ct. at 638, as was the Commission Report in *Pape*. An objective, balanced tone—with respect to appellant and to GM—is sustained throughout the report. In our view, the most adverse inference with respect to appellant's conduct in making his allegations (at least during the phase of the GM–Corvair controversy covered by the subcommittee investigation) is that he reached erroneous conclusions with regard to GM and the Corvair based on an insufficient data base.

In short, we believe that the presence of the clause affirming appellant's good faith advocacy, which is neither explicitly nor implicitly contradicted in the text of the report, effectively precludes a finding that, *as a matter of law*, an inference of falsification and distortion of evidence in order to generate controversy is a rational interpretation of the report. Hence, we do not think appellee's statement is protected, *as a matter of law*, under the *Pape* doctrine.

█ We concur with appellant's assertion that no matter what construction is put on de Toledano's language, the presence of the subcommittee's "good faith" finding with regard to appellant affords a sufficient evidentiary basis from which a reasonable inference of appellee's publication of the disputed statement with actual malice *may* be drawn, *if the jury so chooses*. Appellee's contrary assertion—*i. e.*, that a finding of malice is impermissible because he honestly believed in the truth of his statement when he published it—does not in itself preclude the existence of a factual controversy in this regard. "The defendant in a defamation action brought by a public [figure] cannot . . . automatically insure a favorable [judgment] by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication

was indeed made in good faith." *St. Amant v. Thompson*, 390 U.S. at 732, 88 S.Ct. at 1326. Where a result turns upon a choice of permissible inferences from undisputed evidence, summary judgment may not properly be granted.

We think the position contended for by appellant demonstrates the existence of a triable issue of fact. This is sufficient under the standard controlling summary judgment in public figure libel actions, *see* Part IV, *supra*, to discharge his burden on the motion. This is not to say, of course, that appellant is entitled to judgment on this issue as a matter of law. We hold only that based on the record as it existed before the trial court, a jury triable genuine issue of material fact existed. We thus reverse the grant of summary judgment in favor of appellee de Toledano.

## B. *Appellee Copley Press, Inc.*

Appellant argues, as he did in this "Statement of Genuine Issues" filed in opposition to Copley's motion for summary judgment, that the pretrial record in this case demonstrates the existence of several factual issues regarding Copley's actual malice in syndication of the de Toledano column. He does not directly dispute any of appellee Copley's statement of facts but rather asserts that a chain of permissible inferences of actual malice may be drawn from the asserted facts.

Appellant first contends that a factual controversy exists as to whether Copley had "obvious reasons to doubt the veracity" of appellee de Toledano as a journalist. *St. Amant v. Thompson*, 390 U.S. at 732, 88 S.Ct. at 1326. Appellant designates two factual bases in support of this contention:

(1) Copley editor Donald Charles Ohl's deposition statement that de Toledano was known to him as an experienced journalist and a generally reliable columnist despite his admission that he had never read any of de Toledano's publications and had never met, spoken to, or corresponded with him before Copley's syndication of de Toledano's columns; and (2) Ohl's rejection of a few columns submitted by de Toledano for syndication prior to the January 1975 publication here at issue. From these facts, appellant suggests, a jury could infer that Copley had no knowledge of de Toledano's reliability as a journalist, and therefore published the allegedly libelous column with reckless disregard of its truth or falsity.

In January 1975, when the de Toledano column at issue was published, Ohl had editorial responsibility at Copley for news reports, features, editorials, and columns. He was the Copley employee charged with primary editorial responsibility for the de Toledano column. Ohl said that even though he did not recall having actually read of any of de Toledano's columns or books himself, he had heard of de Toledano and had seen his column printed in The San Diego Sun (a Copley-owned newspaper) prior to Copley's syndication of his columns. Although he did not personally contract on behalf of Copley with de Toledano for syndication of his column, Ohl stated he knew that at the time of the Copley-de Toledano agreement, de Toledano was regarded by Copley Press as a well-known author, reporter, and syndicated columnist.[12] According to Ohl, the fact that a total of 80 newspapers were subscribing to de Toledano's columns at the time Copley commenced syndication of the column provided a sub-

---

12. Appellee de Toledano has been an active journalist since his graduation from Columbia University, in 1938. He worked at various newspapers until 1948, when he became an associate editor for *Newsweek*, one of the nation's leading magazines. In 1956, he was transferred to Washington, D.C. to assume the position of national reports editor for *Newsweek*. That position entailed coverage of national governmental affairs—including developments at the Department of Justice, the Department of Labor, the Supreme Court—and national leaders, such as then Vice-President Nixon. In 1960, he became a syndicated columnist for King Features. As a syndicated columnist, appellee has written about major political and social events. In 1971, he began syndication of his own columns under the name of the National News Research Syndicate. His self-syndication continued until July 1974, when Copley News Service, Inc. agreed to distribute his column. Appellee's column has been syndicated by Copley since the time of that initial agreement.

stantial indication to Copley that de Toledano was generally regarded as a "good, solid factual columnist who was trusted by newspapers." [13] Ohl further stated that he personally shared Copley's opinion that de Toledano had a good reputation for truth and accuracy in the newspaper industry because of his large following among newspaper editors, whom Ohl had found during his 25 years of experience as a reporter, correspondent, and editor to be "tough judges of truth and accuracy."

Ohl's personal experience as editor of de Toledano's column reinforced his initial impression in this regard. During the six months of Copley's syndication of de Toledano's columns before the publication of the statement at issue in this case (*i. e.*, from July 1974 until January 1975), Ohl reviewed "dozens of his columns." The columns provided by de Toledano never gave him any reason to doubt their truth or veracity; to the contrary, he found them to be generally reliable, and approved them for publication with only minor technical changes (*e. g.*, spelling, grammar, etc.). On the few occasions when he rejected de Toledano's submissions (perhaps as many as four, he recalled), Ohl explained he did so because he felt the quality of the writing was inferior or the subject matter discussed was irrelevant because it was outdated. In a couple of instances, Ohl insisted that changes be made in columns in which de Toledano criticized specific newspapers or journalists because he deemed it inappropriate to single out individual press members as targets of criticism. In those situations, Ohl stated the columns were not totally rejected, but were instead edited to reflect criticism of the press on a more generalized basis.

Copley Vice-President and Editor John Pinkerman, a veteran journalist of 43 years, also stated by affidavit that he found de Toledano columns transmitted to Copley to be truthful and accurate in their reportage of facts and events, and that he had never received any complaints regarding the veracity of any of the de Toledano materials distributed by Copley prior to the initiation of the instant action.

Appellant produced no evidence to demonstrate that Ohl, Pinkerman, or any other Copley employee had reason to doubt de Toledano's general accuracy or veracity as a journalist, or that Copley has found any de Toledano column submitted to it objectionable because of its inaccuracy or sheer falsity. Nor does appellant assert that any such evidence would be forthcoming in the event of trial. Appellant's contention that Copley "knew nothing about de Toledano's reliability" when it published the disputed column is thus without support in the record before the court. Contrary to appellant's assertion in this regard, the record establishes an unrebutted factual basis for Copley's belief as to de Toledano's general accuracy and reliability. Appellant has adduced nothing to show that the indicia of reliability on which Copley relied in formulating its opinion as to de Toledano's journalistic integrity were inherently incredible or even unreasonable. As the trial court correctly pointed out in its order granting summary judgment for Copley, viewing the evidence most favorable to appellant, the most that a jury could reasonably infer from these facts was that Copley lacked extensive first-hand knowledge about de Toledano's reliability at the time it agreed to distribute his column, and had only a limited opportunity to assess his accuracy as a columnist thereafter (*i. e.*, before January 1975). These inferences provide inadequate support for a finding of actual malice based on a publisher's lack of a rational basis for a belief in the journalist's reliability.

■ Moreover, even assuming that the record would permit a jury to infer that Copley knew nothing about de Toledano's general reliability, and therefore published without reliance thereon, such an inference would afford an insufficient evidentiary basis for a conclusion of actual malice. A similar contention was rejected by the *Keogh* court's holding that a publisher has cause to suspect an article's accuracy where

---

**13.** De Toledano stated in his deposition that prior to this lawsuit he has been sued for libel only once during his career (in 1942). Appellant has produced no evidence to the contrary.

its author has proven himself to be "persistently inaccurate." *Washington Post Co. v. Keogh,* 125 U.S.App.D.C. at 38 & n.9, 365 F.2d at 971 & n.9. The court in that case declared that proof of "isolated instances of inaccuracy" in a journalist's work or of a journalist's "controversial reputation, even of a reputation for indecency or vulgarity" does not establish actual malice. *Id.* 125 U.S.App.D.C. at 38–39, 365 F.2d at 971–72. In sum, considering the evidence in light of the *New York Times* actual malice standard, we agree with the trial court that appellant has demonstrated no genuine issue of fact as to whether Copley had reason to doubt de Toledano's veracity.

Appellant's next claim is that a genuine issue of fact exists as to whether Copley had "obvious reasons to doubt . . . the accuracy" of the January 1975 de Toledano column. *St. Amant v. Thompson,* 390 U.S. at 732, 88 S.Ct. 1323. Appellant contends that the very nature of de Toledano's statement, charging appellant with distortion and falsification of evidence in order to press an issue, is a sufficient basis for a permissible inference of its publication with reckless disregard of its truth. Appellant maintains that the statement, accusing appellant of a serious breach of honesty and integrity, was of "startling nature and was so inherently improbable that only a reckless man would have published the statement without independent verification of its accuracy."

 The inherent character and content of a publication, or the seriousness of a stated charge, is not dispositive of the issue of recklessness with regard to the truth. *Washington Post Co. v. Keogh, supra,* 125 U.S.App.D.C. at 36–37, 365 F.2d at 969–70. *See New York Times,* 376 U.S. at 287–88, 84 S.Ct. 710.[14] Even if a legal inference of actual malice from the inherent nature of the charge was constitutionally permissible, appellant has adduced no cognizable factual data to buttress his position. Appellant merely asserts that his "professional calling requires a high degree of reliability and accuracy" and "depends largely on his honesty." He fails to demonstrate that he has achieved such an impeccable reputation for truth and accuracy that any suggestion to the contrary must necessarily be of questionable validity. We note that appellant's career as a general public interest advocate has from its inception inspired intense controversy. The iconoclastic nature of many of the viewpoints he has espoused as well as the tactics he has employed have been the target of both high praise and sharp criticism in the arena of public debate. Appellant's assertions that this effectiveness as a public interest advocate requires a reputation for unquestionable integrity are mere conclusory allegations and thus do not qualify as the admissible factual evidence which Rule 56 requires of a party opposing a motion for summary judgment in order to establish a factual dispute. *See* 10 Wright & Miller, *supra,* § 2727, at 540. Although they underscore the detrimental impact which a statement such as de Toledano's may have, such contentions in themselves do not establish the inherent improbability of such a statement. We cannot say that the allegedly libelous statement is of such an extraordinary nature that it would suggest to a publisher a high probability of falsity giving rise to a duty of verification.

Appellant finally maintains that a factual dispute as to Copley's malicious publication of the disputed column is created by Ohl's review and approval of the report for publi-

14. What the *Keogh* court stated in this record bears repeating:

> The most serious charges, which if anything we have the most reason to avoid deterring, may be made responsibly, with no hint of anything contrary to common knowledge, while less serious charges may be made rashly, with internal inconsistencies, citing facts contrary to common knowledge. And there is no basis, empirically or in view of *Times,* for the proposition that "more serious" charges are less likely to be true than "less serious" charges. "No matter how gross the untruth, the *New York Times* rule deprives a defamed public official of any hope for legal redress without proof that the lie was a knowing one or uttered 'in reckless disregard of the truth.' " [125 U.S.App.D.C. at 37, 365 F.2d at 970 (citation and footnote omitted).]

cation.[15] Ohl stated in his deposition that at the time he edited the January 1975 column, he was aware of the general Nader-GM controversy, and of Senator Ribicoff's distribution of a report regarding the Corvair debate because of the wide press coverage which it had been given. Although he had read news stories based on the report, he did not actually read the report before he approved the de Toledano column for distribution to Copley's subscribers. Nowhere in the press reports concerning the Ribicoff investigation did he read that the Committee found or alleged that Nader had falsified and distorted evidence.

Appellant contends that Ohl's failure to read the Ribicoff report referred to in the column and his acceptance of de Toledano's statement—despite the absence of any press statement reporting a Congressional accusation or finding that Nader falsified evidence—demonstrate that there was no factual basis for Ohl's belief in the accuracy of the statement. Had the Congressional subcommittee made such a finding, appellant asserts, it would have been reported extensively in the press; thus, the fact that Ohl had never encountered such a statement in any of the press reports which he read about the investigation should have put him on notice as to the questionable accuracy of the column. A jury could infer from these facts, appellant argues, that Ohl approved the column for syndication with actual knowledge of the falsity of the disputed statement or with reckless disregard of its truth or falsity.

As Ohl's deposition reflects, his knowledge of the Ribicoff report was derived not from a firsthand reading of the report but from his recollection of press reports contemporaneous with the Congressional study release. He recalled as he reviewed the column that the press reports generally established that "some of the charges made against the Corvair by Ralph Nader were not substantiated." He did not remember any reference in any news item relating to,

and thus had no knowledge of, the subcommittee's inclusion of a "good faith" finding as to Nader's allegations against the Corvair, or of any information that tended to cast doubt on the accuracy of the de Toledano column. Ohl stated that his general knowledge of the substance of the press coverage of the report, his opinion as to de Toledano's general reliability for accurate reportage, and his belief that de Toledano's statement was based on a fair interpretation of the report's findings, see *Time, Inc. v. Pape, supra,* furnished the basis for his belief that the statement had a foundation in fact; he entertained no doubt as to its factual verity.

In light of Ohl's deposition testimony, the most favorable inference which can be drawn from appellant's proffered supposition is that Copley was negligent in failing to verify independently the accuracy of de Toledano's statement. However, liability in this instance cannot be predicated upon such investigatory failure. In the absence of an evidentiary showing that a publisher had good reason to suspect its falsity, a statement does not create a duty of inquiry. *St. Amant v. Thompson,* 390 U.S. at 733, 88 S.Ct. 1323; *New York Times,* 376 U.S. at 287–88, 84 S.Ct. 710; *Washington Post Co. v. Keogh, supra,* 125 U.S.App.D.C. at 39–40, 365 F.2d at 972–73. As we have stated above, the nature of the statement in this case in itself cannot give rise to an obligation. Furthermore, the statement's facial compatibility with Ohl's prior knowledge of the Congressional Report provided Ohl with a basis for his belief in its accuracy; thus, no duty of verification arose. Lacking any substantial indication of the necessity therefor, Copley's failure of verification forms no basis for a jury finding of actual malice. Any negligence in this regard is constitutionally inadequate to demonstrate the recklessness that will support a finding of actual malice. *Garrison v. Louisiana,* 379 U.S. at 79, 85 S.Ct. 209.

---

**15.** Copley could not be held liable here on the basis of respondeat superior. *See Cantrell v. Forest City Publishing Co.,* 419 U.S. at 253–54, 95 S.Ct. 465. The contract between Copley and de Toledano is clearly that of an independent contractor. *See generally* 41 Am.Jur.2d *Independent Contractors,* §§ 1–10 (2d ed. 1968).

In summary, we find that appellant's proof has failed to establish a genuine issue of material fact as to Copley's publication of the de Toledano column with actual malice with the convincing clarity which the *New York Times* standard demands, and is thus constitutionally deficient. Appellant cannot satisfy his obligation of showing the existence of a factual dispute that will defeat a summary judgment motion simply by merely asserting that a genuine issue of fact exists or by alleging insubstantial legal conclusions. 10 Wright & Miller, *supra*, § 2727, at 540–42. The inferences which appellant has suggested may permissibly be drawn from the record are insufficient to sustain a conclusion that Copley published the column at issue with a high degree of awareness of its probable falsity, or with reckless disregard for its truth or falsity. *St. Amant v. Thompson*, 390 U.S. at 731–32, 88 S.Ct. 1323; *New York Times*, 376 U.S. at 279–80, 84 S.Ct. 710. Because appellant has failed to demonstrate the existence of a jury triable issue of material fact, as required by *New York Times* and Super.Ct. Civ.R. 56(c), we hold that summary judgment was properly granted to appellee Copley Press, Inc. and hence affirm the trial court's ruling in this regard.

*Reversed in part, and affirmed in part, and remanded for further proceedings consistent with this opinion.*

## APPENDIX

*Ralph de Toledano*

### NADER'S FORCES WORKING DESTRUCTIVELY

Ralph Nader and his cohorts are at it again, working overtime to sabotage American efforts to achieve energy independence and economic balance. Their target is nuclear power, a subject about which—as any reputable scientist will tell you—the sum total of Nader's knowledge could be comfortably stuffed in a frog's ear.

In this endeavor, Nader is being aided and abetted by Sen. Abraham Ribicoff, D–Conn., who not too long ago devoted some 250 devastating columns of the Congressional Record to demonstrate conclusively that Nader falsified and distorted evidence to make his case against the automobile.

In recent articles for the New York Times, Ribicoff displayed an amazing ignorance of the facts when he called for "breaking the nuclear habit."

Now Nader and his eco-freaks know what they are about to this extent. They want to shut down most of this country's industrial plants and send us back to the spinning wheel. Because Nader believes in this, he assumes that the American people agree. As he said not too long ago, "If they had to choose between nuclear reactors and candles, they would choose candles." (That candles are far more polluting than light derived from fossil fuels hardly troubles the man.)

As usual, Nader is using fright-wig tactics to coerce the country into dropping its nuclear power program—a program which, to our cost and sorrow, he has been able to slow down at a time when it is most needed.

He screams that "the risks of accident . . . are at a point of catastrophic consequence unparalleled in the history of mankind"—a statement blatantly at odds with the fact that not a single member of the public has been hurt in the operation of a nuclear power plant.

Nader's analysis of the workings of such plants has been characterized by Morris Hulin, a respected nuclear engineer, as "bordering on complete falsehood." And when an Atomic Energy Commission official some time ago challenged Nader "and other unreasoning critics of nuclear energy" to a debate "based on precise facts, not overstated generalities," Nader, in typical fashion, ran away.

What bothers Nader and his eco-freaks is that today nuclear power is cleaner than fossil-fuel power, and economically competitive.

The "dangerous" breakdowns he cites in nuclear power plants are for the most part in the non-nuclear aspects of their operation and, in point of fact, occur less often than

similar breakdowns in conventional power plants.

The Nader-Ribicoff alternative to nuclear power is the use of solar energy—a Rube Goldberg dream which they argue is just around the corner. It all sounds very pretty. But no scientist looks at solar power as anything but a very remote possibility. The economics of solar power, moreover, would bankrupt the country—which, of course, does not concern Nader and company.

It would require a solar energy plant 20 square miles in area to produce the energy we can get today from 9,000 tons of coal.

And the cost of solar electric system, as of now, would be in the $40,000–$80,000-per-kilowatt range. Nader might think of this the next time he turns on a 100-watt bulb.

The Nader drive to turn back the clock and drive this country to economic suicide would be laughable. But John Gofman, president of the Task Force Against Nuclear Pollution, working with Nader, has developed what he terms a "boot in the butt" approach to lobbying. Gofman says frankly that he and his eco-freaks are out to "diselect" members of Congress who oppose their efforts to outlaw nuclear power.

His organization is collecting signatures from those impressed by the scare propaganda, and Gofman predicts that by the next election, "the drive may be strong enough to influence half the Congress."

Two months ago, they had already sold the anti-nuclear gold brick to 120,000 gullible citizens. But be not dismayed. When the lights go out, you can always light a candle.

HARRIS, Associate Judge, concurring in part and dissenting in part:

I am convinced that the trial court, in granting both defendants' motions for summary judgment, applied the correct standard (actually the very standard the majority ultimately endorses) and decided the issues correctly.[1] Therefore, while I concur in the majority's affirmance of the ruling in favor of defendant-appellee Copley Press, I respectfully dissent from the majority's reversal of the trial court's granting of summary judgment in favor of defendant-appellee de Toledano.

In addition, I register perplexity at the majority's traversing such a long and tortuous path to arrive at the point of expressing the summary judgment standard for such cases. In my view, the majority enmeshes itself in a needlessly extended discussion, injecting confusion into an area of the law which has appeared clear to virtually every court—including the trial court in this case—that has confronted the matter.

**I**

Addressing my latter concern first, I respectfully submit that the majority has misread much of the directly relevant case law, and that it incorrectly concludes that the standard enunciated and applied by the trial judge was improper. Initially, I fear that the majority focuses too much attention upon Judge WRIGHT's concurring opinion in *Wasserman v. Time, Inc.*, 138 U.S.App.D.C. 7, 9, 424 F.2d 920, 922, *cert. denied*, 398 U.S. 940, 90 S.Ct. 1844, 26 L.Ed.2d 273 (1970). As I read that brief opinion, Judge WRIGHT offered two suggestions for the disposition of public figure libel cases: (1) Because of the significant

1. The standard as described by the majority is slightly camouflaged, in that the majority repeatedly (1) leaves out the word "reasonable" as it must be applied to a prospective jury in discussing the trial judge's evaluation of what the jury may be permitted to consider, (2) emphasizes the words "could find" with reference to the jury's role to imply, at least, some diminution of the trial judge's role at the summary judgment stage, and (3) does not emphasize the necessity for a plaintiff to show "actual malice

with convincing clarity"—inescapably the most vital part of the standard under *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)—in an apparent attempt to subordinate that part of the test to a jury's otherwise free rein to find malice where none has been shown to the requisite degree. These devices, apparently found useful by the majority in an effort to support its result, cannot alter the law; the proper standard must be considered in its totality.

 First Amendment implications, the heightened clear-and-convincing-proof-of-actual-malice burden must be applied at the summary judgment stage, and (2) "[i]f the case survives the defendant's summary judgment motion, the trial court" in ruling on a later motion for a directed verdict should itself weigh the evidence and draw the most reasonable inferences and conclusions therefrom. *Id.*, 138 U.S.App.D.C. at 9, 424 F.2d at 922. The majority interprets Judge WRIGHT's opinion as proposing that the second of his suggestions be applied at the summary judgment stage as well as after the close of the plaintiff's case at trial. While I disagree with that interpretation, a few other courts appear to have reached the same conclusion in considering Judge WRIGHT's language. *See Fadell v. Minneapolis Star & Tribune Co.*, 557 F.2d 107, 108 (7th Cir.), *cert. denied*, 434 U.S. 966, 98 S.Ct. 508, 54 L.Ed.2d 452 (1977); *Bon Air Hotel, Inc. v. Time, Inc.*, 426 F.2d 858, 864–65 (5th Cir. 1970). Since that distinction is not of significance in this case, I am willing to accept the majority's interpretation arguendo.

In any event, the fact is that virtually every court dealing with the subject, both before and after *Wasserman* (including the cases cited by the majority), has explicitly acknowledged the validity of the first of Judge WRIGHT's suggestions (that the trial judge must take into account the *New York Times v. Sullivan*-mandated-clear-and-convincing-proof standard at summary judgment) and rejected Judge WRIGHT's second suggestion (that the trial court in these cases should usurp the jury's task of weighing the evidence and drawing any legitimate inferences therefrom). *See, e. g., Fadell v. Minneapolis Star & Tribune Co., supra; Walker v. Cahalan*, 542 F.2d 681, 684 (6th Cir. 1976), *cert. denied*, 430 U.S. 966, 97 S.Ct. 1647, 52 L.Ed.2d 357 (1977); *Alioto v. Cowles Communications, Inc.*, 519 F.2d 777, 780 (9th Cir.), *cert. denied*, 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 259 (1975); *Guam Federation of Teachers, Local 1581 v. Ysrael*, 492 F.2d 438, 441 (9th Cir.), *cert. denied*, 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974); *Bon Air Hotel, Inc. v. Time, Inc.,*

*supra; Goldwater v. Ginzburg*, 414 F.2d 324, 337–40 (2d Cir. 1969), *cert. denied*, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970); *Time, Inc. v. McLaney*, 406 F.2d 565, 572–73 (5th Cir.), *cert. denied*, 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969); *Hutchinson v. Proxmire*, 431 F.Supp. 1311, 1328, 1330 (W.D.Wis.1977), *aff'd*, 579 F.2d 1027 (7th Cir. 1978), *rev'd on other grounds*, —— U.S. ——, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979); *Wolston v. Reader's Digest Association, Inc.*, 429 F.Supp. 167, 179 (D.D.C. 1977), *aff'd*, 188 U.S.App.D.C. 185, 578 F.2d 427 (1978), *rev'd on other grounds*, —— U.S. ——, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979); *Buchanan v. Associated Press*, 398 F.Supp. 1196, 1204–05 (D.D.C.1975); *Kent v. Pittsburgh Press Co.*, 349 F.Supp. 622 (W.D.Pa. 1972); *West v. Northern Publishing Co., Alaska*, 487 P.2d 1304 (1971); *Phoenix Newspapers, Inc. v. Church*, 24 Ariz.App. 287, 537 P.2d 1345, 1356 (1975); *Stone v. Essex County Newspapers, Inc.*, 367 Mass. 849, 330 N.E.2d 161, 175 (1975); *Chase v. Daily Record, Inc.*, 83 Wash.2d 37, 515 P.2d 154, 157 (1973). *See also Hoffman v. Washington Post Co.*, 433 F.Supp. 600, 604–05 (D.D.C.1977), *aff'd by unpublished opinion* (D.C.Cir., No. 77–1773, May 23, 1978). Some courts have been more explicit than others in setting forth the appropriate standard, but by no means can it accurately be said that there are alternative approaches abroad in the land.

In my view, the majority creates a nonexistent debate in its insistence that several courts (including the trial court herein) have embraced the mistaken view that at summary judgment (or an analogous juncture), the trial judge should, after considering the evidence in the light most favorable to the plaintiff, decide whether he or she is satisfied that actual malice has been established by clear and convincing proof. The proper inquiry for the judge to make is not whether he personally believes that the clear and convincing proof standard has been met; rather, the judge is to decide whether a reasonable juror permissibly could so conclude. Thus, I cannot accept the majority's thesis that several courts,

taking a cue from Judge WRIGHT in *Wasserman, supra,* have endorsed and/or applied the incorrect approach, and that only *Guam Federation of Teachers, supra* (and a line of cases guided by it), illuminates the proper approach to the task.

In *Wasserman, supra,* Judge WRIGHT said in part that "the trial court . . . must decide whether actual malice has been shown with 'convincing clarity.'" 138 U.S. App.D.C. at 9, 424 F.2d at 922. Perhaps we ought not focus too closely on Judge WRIGHT's precise choice of words, inextricably linked as they may be in some readers' minds with his poorly received second suggestion that trial judges themselves should weigh the evidence in deciding such matters. The majority apparently has been distracted in this way. The fact is that several other courts—all of which have rejected the suggestion that the trial judge weigh the evidence—have expressed similarly the approach they must take in dealing with such motions in public figure libel cases. To set forth a number of such statements in abbreviated fashion: (1) "[N]one of the proofs . . . satisfies the constitutional standard with the convincing clarity necessary to raise a jury question . . ." *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 55, 91 S.Ct. 1811, 1825, 29 L.Ed.2d 296 (1971). (2) The "record . . . demonstrated that no proof was adduced that had 'the convincing clarity' [demanded by *New York Times v. Sullivan*]." *Time, Inc. v. McLaney, supra,* at 573. (3) "Such techniques do not rise to the constitutional level of a clear and convincing showing of reckless disregard." *Meeropol v. Nizer,* 381 F.Supp. 29, 35 (S.D.N.Y.1974), *aff'd in relevant part,* 560 F.2d 1061, 1065 (2d Cir. 1977), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1979). (4) "Having reviewed the extensive record, I conclude that plaintiff has failed to raise a genuine question as to the existence of [actual malice]." *Oliver v. Village Voice, Inc.,* 417 F.Supp. 235, 239 (S.D.N.Y.1976). (5) "[T]he defendants here were entitled to summary judgment unless [plaintiff] . . . could show enough to go to a jury on the issue of actual malice." *Wolston v. Reader's Digest Association, Inc., supra,* 188 U.S.App.D.C. at 189, 578 F.2d at 431. (6) "[D]efendant's motion should be granted if plaintiff is unable to establish clearly and convincingly that defendants acted with actual malice. [Citation omitted.]" *Wolston v. Reader's Digest Association, Inc., supra,* 429 F.Supp. at 179. (7) "The record in this case fails to demonstrate that plaintiff could produce clear and convincing evidence that each defendant acted with actual malice." *Hoffman v. Washington Post Co., supra,* at 605. (8) "After review of all the evidence which would be introduced at trial . . . there would be no jury issue on malice." *Buchanan v. Associated Press, supra,* at 1205. Finally, (9):

> The record . . . demonstrates that no proof of actual malice has been adduced that has "the convincing clarity which the constitutional standard demands." [Citing *New York Times v. Sullivan* and *Time, Inc. v. McLaney, supra.*]

\* \* \* \* \* \*

> "Unless the court finds . . . that the plaintiff can prove actual malice in the *Times* sense, it should grant summary judgment." *Bon Air Hotel, Inc. v. Time, Inc., supra,* 426 F.2d at 864; *Wasserman v. Time, supra,* 138 U.S.App.D.C. 7, 424 F.2d at 922.

*LaBruzzo v. Associated Press,* 353 F.Supp. 979, 987–88 (W.D.Mo.1973). See also the formulation in *Curran v. Philadelphia Newspapers, Inc.,* —— Pa.Super. ——, 395 A.2d 1342, 1348 (1978) (virtually identical to that in *LaBruzzo, supra*—also citing *Bon Air* and *Wasserman*).

In this case, the trial judge quite accurately framed the summary judgment standard as follows:

> In considering a motion for summary judgment, the first task of this Court is the determination of whether there exist any genuine issues of material fact, Rule 56(c), Civil Rules of the Superior Court. To demonstrate the existence of such issues, a public figure plaintiff in a libel action must show that the evidence and permissible inferences, when viewed as

favorably as possible for the plaintiff, establish with convincing clarity that the defendants acted with actual malice.

There simply is no basis for the majority's conclusion that some or all of the cited courts (and others which have expressed in similar fashion the decisional task to be performed) have strayed from the correct approach. The passages quoted above vary slightly in phraseology, but it is clear to me that each of those courts—including the trial court in this case—in some fashion, albeit often rather abbreviated, effectively indicated its understanding and consideration of the proper question: Could a reasonable jury, on the basis of all the evidence before the judge, find clear and convincing proof of the publication of a defamatory falsehood with actual malice?

I am puzzled by the majority's attraction to *Guam Federation of Teachers, supra,* as supposedly uniquely bearing the standard to be followed. That court stated in part:

The *standard* against which the evidence must be examined is that of *New York Times* and its progeny. But the *manner* in which the evidence is to be examined in the light of that standard is the same as in all other cases in which it is claimed that a case should not go to the jury. If the evidence, so considered, measures up to the *New York Times* standard, the case is one for the jury . . . . [492 F.2d at 441 (emphasis in original).]

I have tried unsuccessfully to find a meaningful difference between Judge Goodrich's statement that the evidence (considered most favorably to the plaintiff) must estab-

lish with convincing clarity that the defendants acted with actual malice, and the *Guam* court's directive that the evidence (considered most favorably to the plaintiff) must measure up to the *New York Times* standard.[2]

I am well aware that some courts have expounded with greater precision upon the function they properly are performing. In *Dacey v. Florida Bar, Inc.,* 427 F.2d 1292, 1296 (5th Cir. 1970), the court held:

[D]efendant was entitled to a summary judgment because there are no issues of material facts in dispute and there is no evidence "which would permit a fact finder to conclude that the standard laid down by the Supreme Court had been met by the plaintiff." *McLaney* [*supra*], 406 F.2d at 573.

The court in *Guitar v. Westinghouse Electric Corp.,* 396 F.Supp. 1042, 1054 (S.D.N.Y. 1975), *aff'd,* 538 F.2d 309 (2d Cir. 1976), dismissing on summary judgment, stated: "Here, no proof has been presented from which a jury could infer malice." *See also Dacey v. Connecticut Bar Association,* 170 Conn. 520, 368 A.2d 125, 136 (1976); *Stone v. Essex County Newspapers, Inc., supra,* 330 N.E.2d at 175 & n. 11 (1975); *Airlie Foundation, Inc. v. Evening Star Newspaper Co.,* 337 F.Supp. 421, 423–24 (D.D.C. 1972). There is simply no support for the proposition that these courts were doing something different—or even believed they were doing something different—than all the courts (including the *Guam* court) which have been somewhat less exact in their phraseology.[3] This conclusion is, of course,

---

**2.** *See also Alioto v. Cowles Communications, Inc., supra,* which explicitly followed *Guam.* In *Alioto,* the Ninth Circuit stated in part:

A district judge on motion for judgment n. o. v., or an appellate judge on review, must examine the evidence to see whether, if all permissible inferences were drawn in the plaintiff's favor and all questions of credibility were resolved in his behalf, the evidence then would demonstrate by clear and convincing proof that the libelous material was published with actual malice. [519 F.2d at 780.]

**3.** Illustratively, in *Time, Inc. v. Pape,* 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971), the

majority opinion contains the following language:

The deliberate choice of such an interpretation [of the article sub judice], though arguably reflecting a misconception, was not enough to create a jury issue of "malice" under *New York Times.* [*Id.,* at 290, 91 S.Ct. at 639.]

The late Mr. Justice Harlan, disagreeing with the majority as to the role of an appellate court in a public figure libel case, stated in his dissent:

The step taken today, whereby this Court undertakes to judge, "on the specific facts of this case," *ante,* at [292, 91 S.Ct. at 640,] whether a jury could reasonably find that

buttressed by the several citations in the few cases which express the formula most succinctly to several of the cases which express it with less precision.

My basic point is simple. The majority has set forth upon an imprudent adventure to grapple with distinctions without difference, and offers as its bounty to this jurisdiction page after page of "illumination" which, as far as I can see, can only muddle what already was clear to the trial judge and, I submit, most others.

## II

As I have noted, there is little dispute as to the proper function of the trial court at the summary judgment stage in a public figure libel case.[4] As the majority acknowledges, the hurdle a plaintiff must surmount to survive such a motion properly is a substantial one, in view of the obvious First Amendment ramifications attending the mere fact of such litigation. *See Washington Post v. Keogh,* 125 U.S.App.D.C. 32, 35, 365 F.2d 965, 968, *cert. denied,* 385 U.S. 1011 (1966); *Guam Federation of Teachers, Local 1581 v. Ysrael, supra,* at 441; *Bon Air Hotel v. Time, Inc., supra,* at 864–65; *Buchanan v. Associated Press, supra,* at 1205; *Guitar v. Westinghouse, supra,* at 1053–54. While it may well be inaccurate to say that the granting of summary judgment is "the 'rule', and not the exception, in defamation cases,"[5] *Hutchinson v. Proxmire, supra,* —— U.S. at —— n. 9, 99 S.Ct. at 2680 n. 9 (and text accompanying), it is clear that when a defendant in such a libel action moves for summary judgment on the ground (supported by affidavits) of lack of actual malice, a heavy burden rests upon the plaintiff to make an affirmative evidentiary showing that there is indeed a genuine issue of fact as to actual malice. *See, e. g., Buchanan v. Associated Press, supra,* at 1205.

In my view the trial court, despite what might be considered to be minor imperfections in phraseology, formulated and applied the appropriate standard and correctly granted both defendants' summary judgment motions. Having studied the majority's lengthy discussion on summary judgment, I still readily endorse the trial judge's well-reasoned approach to the matter. I can find little fault with the heart of his analysis:

> [U]ncontroverted statements in the affidavit of defendant de Toledano clearly evince a reliance on the *entire text* of the report in the Congressional Record as support for the statements in the column. The good faith disclaimer is the only evidence produced by the plaintiff to impugn defendant's repeated assertions in the record that he honestly believed in the accuracy of his characterization of the material in the Congressional Record (de Toledano's affidavit and deposition).

The Court's reading of the Congressional Record suggests that the single passage regarding the plaintiff's "good faith" was more of a sugar coating for a bitter pill than an accurate reflection of the content of the report. Viewing the disclaimer in the context of the complete document, the most favorable inference which can be derived for the plaintiff is that de Toledano's interpretation, although defensible, was mistaken.[6]

Time magazine's characterization of the Commission's Report was sufficiently inaccurate to permit the concomitant finding that it was published with "malice," is, in my judgment, not warranted. [*Id.,* at 293, 91 S.Ct. at 641.]

Nonetheless, in *Time, Inc. v. Pape*—which I consider to compel affirmance in this case—there is no hint that the majority and the dissenter differed at all as to the nature of the test to be applied by the trial judge.

4. Appellant Nader does not dispute his status as a public figure. The recent Supreme Court decisions in *Wolston v. Reader's Digest Assn., Inc., supra,* and *Hutchinson v. Proxmire, supra,* do not alter appellant's status in this regard.

5. *See Guitar v. Westinghouse, supra,* 396 F.Supp. at 1053; *Oliver v. Village Voice, Inc., supra,* 417 F.Supp. at 237.

6. A brief explanation of the subject report would be useful. First, it was a staff report, prepared by two members of the staff of the Subcommittee on Executive Reorganization. It was not formally endorsed by any member of the Senate, but it was placed in the Congres-

I agree with the trial judge that the Supreme Court's decision in *Time, Inc. v. Pape*, 401 U.S. 279, 91 S.Ct. 633, 38 L.Ed.2d 45 (1971), firmly supports—indeed mandates—the granting of summary judgment in Nader's suit against de Toledano. In light of all the facts, I share Judge Goodrich's belief that there is no jury-triable issue of actual malice in de Toledano's published statement that:

> [In his opposition to nuclear energy], Nader is being aided and abetted by Sen. Abraham Ribicoff, D–Conn., who not too long ago devoted some 250 devastating columns of the Congressional Record to demonstrate conclusively that Nader falsified and distorted evidence to make his case against the [Corvair].

Surely de Toledano's interpretation of the whole of the staff report, as reflected by that statement, should be protected and privileged as a rationally defensible choice among a range of interpretive alternatives.

It is undisputed that de Toledano's allegedly libelous assertion was based on his careful reading of the entire staff report. The assertion itself alludes to the full length of the report, and de Toledano in his deposition and affidavit (and in his brief on appeal) pointed to several specific portions of the report on which he relied. He readily admitted to having read the staff's brief statement of a belief in Nader's good faith which prefaced the report. He stated, nevertheless, that he believed that Nader lied and deceived the public concerning the Corvair, and that such a belief was based on

sional Record without objection by Senator Ribicoff. 119 Cong.Rec. S5870 (daily ed. Mar. 27, 1973). The report occupied more than 80 pages in the Congressional Record. Its substance was preceded by a two-paragraph summary. While the majority quotes that summary, it repeatedly exaggerates its import. Hence, I quote it again; it reads in full as follows:

> For more than two and a half years, we have conducted an extensive investigation into Mr. Ralph Nader's charges that statements of certain General Motors witnesses at the hearing of March 22, 1966, misled the Subcommittee on Executive Reorganization concerning the safety of the Corvair automobile. After consideration of all the relevant

his reading of the whole report. *See Time, Inc. v. Pape, supra*, at 285, 289, 91 S.Ct. 633. Additionally, it must be recognized that de Toledano asserted only that the staff report had *demonstrated* conclusively that Nader had "falsified and distorted evidence . . ." He did not say "Sen. Ribicoff stated that Nader had falsified and distorted evidence," or anything of that nature. Had de Toledano attributed such words to Senator Ribicoff, we might well have a different case.

Given all of the facts, I consider it to be an alarming affront to the principles of the First Amendment for the majority to direct that this case should proceed to a jury trial. Obviously, de Toledano's showing in support of his motion was not per se dispositive, *see St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), and it was not taken as such by the trial court. However, to rebut that showing Nader could offer only the allegedly libelous statement itself and the staff members' statement that "we believe [Nader's original charges] were made in good faith." (That statement, incidentally, falls considerably short of constituting a "finding," as the majority repeatedly characterizes it.) I share the trial judge's conviction that, viewing all the evidence in the light most favorable to Nader, he simply did not meet his burden of demonstrating that a jury reasonably could find clear and convincing proof of actual malice. Having studied the record, I see no error in Judge Goodrich's conclusion that:

> evidence, we have concluded that the subcommittee was not misled and hence there is no basis for reopening the hearings for further testimony on the stability and handling of the Corvair.
>
> Although we have not upheld Mr. Nader's charges against the Corvair and General Motors, we believe they were made in good faith based on the information available to him. After gathering all the evidence concerning them, we can understand how he reached the positions stated in his letters. The documents he cites provide some support for his views. However, we believe the clear preponderance of the evidence, much of which was unavailable to Mr. Nader, is on the other side.

[V]iewing the disclaimer in the context of the complete document, the most favorable inference which can be derived for the plaintiff is that de Toledano's interpretation, although defensible, is mistaken.

*See Time, Inc. v. Pape, supra,* at 290–92, 91 S.Ct. 633. (A much less favorable inference which could have been drawn, for example, would be that de Toledano's assertion was absolutely correct.) [7]

In my judgment the majority has turned a blind eye to the true meaning of the *Time, Inc. v. Pape* decision. The majority narrows its focus to the *Pape* Court's conclusion (based, of course, on the facts of that case) that "Time's omission of the word 'alleged' amounted to the adoption of one of a number of possible rational interpretations of a document that bristled with ambiguities," 401 U.S. at 290, 91 S.Ct. at 639, and thereby too easily dismisses *Pape's* true significance to this case. The foundation of the *Pape* decision was the Court's recognition of the special susceptibility to libel suits of those who publish reports of what others have said or written, if such publishers could be found liable merely for possible errors of interpretation. *See* 401 U.S. at 285–86, 291, 91 S.Ct. 633. I quote from *Pape*:

New York Times was premised on a recognition that, as Madison put it, "Some degree of abuse is inseparable from the proper use of everything; and in no instance is this more true than in that of the press." 4 J. Elliot's Debates on the Federal Constitution 571 (1876). With respect to errors of fact in reporting events, we said in *New York Times*: "A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions—and to do so on pain of libel judgment virtually unlimited in amount—leads to * * * 'self-censorship.' Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean

that only false speech will be deterred. Even courts accepting this defense as an adequate safeguard have recognized the difficulties of adducing legal proofs that the alleged libel was true in all its factual particulars. * * * Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so." 376 U.S., at 279 [, 84 S.Ct. 710, at 725].

These considerations apply with even greater force to the situation where the alleged libel consists in the claimed misinterpretation of the gist of a lengthy government document. . . . [401 U.S. at 290–91, 91 S.Ct. at 639–640.]

In short, *Pape* dictates a spirit of protectiveness in the area of secondary attributions (in order to insure that interpretive reporting is judged by the *New York Times* standard) which covers de Toledano's predicament. Anything more than the most cursory (or one-sided) consideration of the complete staff report makes manifest its ambiguous tenor. To be sure, the ambiguity is of a different sort from that of the Civil Rights Commission's report which was at the core of the dispute in *Pape.* The report in *Pape* (referring to several alleged instances of police brutality) was written from beginning to end in such a way as to support an interpretation that its authors believed the allegations to be true—notwithstanding the authors' consistent inclusion of the word "alleged." In comparison, the glaring ambiguity of the staff report in this case lies in the juxtaposition, on the one hand, of brief introductory remarks which include a sentence supportive of Nader's good faith, and, on the other hand, the long and detailed body of the report (and the appended exchange of memoranda between Nader and the subcommittee) which—even

---

**7.** It might be said that the court gratuitously offered its implicit adherence to such a view when it spoke of the disclaimer, in the context of the whole report, as "a sugar coating for a bitter pill." However, that expressive detour should not distract us from the validity of the trial court's overall approach under the proper standard.

considered in a light favorable to Nader—in many places clearly supports de Toledano's allegations, although stopping just short of saying so. I feel certain that the *Pape* Court would have ruled that de Toledano's interpretive comment on what Senator Ribicoff's subcommittee's staff report had demonstrated is not the stuff of a jury-triable libel issue. I believe that *Pape's* teachings should be dispositive here:

> The deliberate choice of such an interpretation, though arguably reflecting a misconception, was not enough to create a jury issue of "malice" under *New York Times.* [401 U.S. at 290, 91 S.Ct. at 639.]
>
> \* \* \* \* \* \*
>
> Where the document reported on is so ambiguous as this one was, it is hard to imagine a test of "truth" that would not put the publisher virtually at the mercy of the unguided discretion of a jury. [*Id.,* at 291, 91 S.Ct. at 640.]

*See Dickey v. CBS, Inc.,* 583 F.2d 1221, 1226 (3d Cir. 1978); *Hutchinson v. Proxmire, supra,* 431 F.Supp. at 1329; *Buchanan v. Associated Press, supra,* at 1205; *Airlie Foundation v. Evening Star Newspaper Co., supra,* 337 F.Supp. at 424–25.

It may be said, indeed, that the document de Toledano was faced with interpreting presented a greater problem than mere ambiguity. Specifically, the result the majority reaches today signals that a few introductory platitudes (in all likelihood motivated by a simple sense of political etiquette) prefacing an otherwise straightforward and hard-hitting official investigatory report subsequently may provide the justification for a libel suit. In other words, what may have been intended by the staff as a mere political shield effectively has been turned by the majority into a sword holding a response worthy of First Amendment protection at bay.

Cutting through the majority's extended discussion, the ultimate basis for reversal appears to be the following statement in the majority opinion:

> In short, we believe that the presence of the clause affirming appellant's good faith advocacy, which is neither explicitly nor implicitly contradicted in the text of the report, effectively precludes a finding that, *as a matter of law,* an inference of falsification and distortion of evidence in order to generate controversy is a rational interpretation of the report. Hence, we do not think appellee's statement is protected, *as a matter of law,* under the *Pape* doctrine. [*Ante,* at 53.]

Anyone familiar with the full text of the voluminous staff report readily would recognize the extent to which the majority opinion fails to characterize it accurately. Beyond that, I fear the basis for decision quoted above is likely not merely to have a chilling effect upon the expression of conflicting viewpoints on issues of vital public importance, *see Washington Post Co. v. Keogh, supra,* 125 U.S.App.D.C. at 35, 365 F.2d at 968; it could drop an ice curtain around the exercise of journalistic freedom in interpreting congressional and similar governmental reports. It is particularly distressing to me that such a precedent is being set in the public information center of the United States, as the nation's capital is the origin of a myriad of such reports.

The result which the trial court reached and which I would affirm as to defendant de Toledano would not mean that no public figure plaintiff could ever survive a motion for summary judgment. Several of the cases cited *supra* and in the majority opinion reflect the contrary. The burden a public figure libel plaintiff must meet to prevail on summary judgment *is* a heavy one. Nonetheless, there should be no shrinking from our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open . . . ." *New York Times v. Sullivan, supra,* 376 U.S. at 270, 84 S.Ct. at 721. The majority opinion itself includes a lengthy introductory discussion of First Amendment libel law, and appears to recognize the importance of such a body of law in assuring the continued unfettered exchange of ideas. To me, however, the existing standards are more than a set of abstract principles to be accorded lip-service and then ignored.

The statement written by appellee de Toledano by which appellant Nader feels aggrieved may well not be a model of clinical objectivity in reporting. However, it is virtually universally recognized that little in contemporary journalism is wholly free of some predisposition on the part of its author. That fact does not make what arguably may even be perceived as a gross inaccuracy actionable. Appellant Nader functions by choice in the public eye. He, as well as others across the full range of the political and philosophical spectrum, must accept certain inevitable consequences of so functioning. Judge (now Mr. Justice) STEVENS once aptly noted that:

> Whether we are moved to applaud or to despise what is said, our duty to defend the right to speak remains the same. [*Gertz v. Robert Welch, Inc.*, 471 F.2d 801, 808 (7th Cir. 1972), *rev'd on other grounds*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).]

This basic precept bears constant reminder.

In concluding this statement of reasons why I would affirm both rulings of the trial court, I express my agreement with the words of Chief Judge Kaufman as written for the court in *Edwards v. National Audubon Society, Inc.*, 556 F.2d 113, 122 (2d Cir. 1977):

> [W]e believe that the interest of a public figure in the purity of his reputation cannot be allowed to obstruct that vital pulse of ideas and intelligence on which an informed and self-governing people depend. It is unfortunate that the exercise of liberties so precious as freedom of speech and of the press may sometimes do harm that the state is powerless to recompense: but this is the price that must be paid for the blessings of a democratic way of life.